**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO.: 24-cv-2576

LOULILLIAN WATSON,[1]

      Plaintiff,

v.

UNIVERSITY OF COLORADO BOULDER; THE BOARD OF REGENTS FOR UNIVERSITY OF COLORADO, BOULDER;
JUSTIN SCHWARTZ, individually and as agent for University of Colorado, Boulder;
KATE BAUER, individually and as agent for University of Colorado, Boulder;
LANCE CARL, individually and as agent for University of Colorado, Boulder;
EMILY PFLEGHAAR, individually and as agent for University of Colorado, Boulder;
ANN GUSHURST, individually and as agent for University of Colorado, Boulder;
VALERIE SIMONS, individually and as agent for University of Colorado, Boulder;
LLEN POMEROY, individually and as agent for University of Colorado, Boulder;
REGINA TIRELLA, individually and as agent for University of Colorado, Boulder;
DANIEL EASTON, individually and as agent for University of Colorado, Boulder;
HOLLY NELSON, individually and as agent for University of Colorado, Boulder;
LISA POTOKA JONES, individually and as agent for University of Colorado, Boulder;
WILL DEWESE, individually and as agent for University of Colorado, Boulder; and
LAURA EMMOT, individually and as agent for University of Colorado, Boulder,

      Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

      **COMES NOW** the Plaintiff, Loulillian Watson, by and through her attorneys, The Savela Law Firm, P.C., respectfully alleges as follows:

**THE NATURE OF THE ACTION**

      1.    This case arises out of the actions taken and procedures employed by the Defendants, the University of Colorado, Boulder through its Board, The Board of Regents for the University of Colorado ("CU Boulder"), CU Boulder's Office of Institutional Equity and

---

[1] Pursuant to the Court's Order dated April 3, 2025 (ECF 80), Plaintiff files a Second Amended Complaint replacing "Jane Roe" with the Plaintiff's name. John Doe, the Complainant in this case, is a pseudonym.

Compliance (OIEC), CU Boulder football coaches and staff, and the Hearing Officer, Sanctioning Board, and Appeal Board assigned by CU Boulder to this case.

2.      The incident at issue here was an accident, pure and simple. John Doe, the "Complainant" [2] in this case, told police, the CU Boulder football coaching staff, and everyone around him that what happened was an accident or a mistake. This is a story of a young, black woman, Loulillian Watson ("Plaintiff"), fighting against the strength and influence of the CU Boulder football organization. Loulillian Watson had no chance.

3.      On February 2, 2022, Loulillian Watson and John Doe, undergraduate students at CU Boulder at the time, were spending time at Doe's apartment in Boulder. As Ms. Watson was gathering her belongings to leave, Doe took Ms. Watson's purse and held it over his head where she could not reach it. Doe held a pair of scissors in one hand and Ms. Watson's purse in the other. Doe threatened to cut up Ms. Watson's purse, insisting some of the items she had gathered belonged to him. At that point, Ms. Watson grabbed a small paring knife from the counter. As she reached up to grab her purse, Doe accidentally leaned into the knife.

4.      As young, black students in Boulder, Colorado, the pair were apprehensive to report the incident. Both were very wary of police involvement, and both had their futures to consider. However, as soon as they realized that the wound may need medical attention, they drove together to the hospital. Doe had a small wound that required exploratory surgery. He was released the following day.

5.      Both Doe and Ms. Watson agree that the incident was an accident. Ms. Watson told police multiple times that the incident was an accident. *See*, *e.g.*, Ex. 17 at 32-33. Ms. Watson told the public defender that the incident was an accident. *See* Ex. 16 (letter from

_____

[2] The formal Complaint in this case was signed and submitted by Defendant Pomeroy, on behalf of CU Boulder. Ex. 5. John Doe, a pseudonym for the "Complainant" in this case, expressly told CU Boulder football staff and coaches, the police, and everyone around him that he did not report the incident *See*, *e.g.*, Ex. 21 (noting that Doe told football coaches and staff multiple times that he did not want to report the incident).

Ms. Watson to public defender). Doe told the OIEC investigator that the incident was a mistake. Ex. 31 at 17. Doe told the Colorado State Public Defender multiple times that the incident was an accident and a mistake. Exs. 27, 28, 29. Doe wrote an Impact Statement to the Appeal Board expressly stating that his incident was an accident and nothing more. *See* Ex. 12 (Doe's impact statement).

6.      Loulillian Watson should not have been expelled from CU Boulder. Loulillian Watson should not have a permanent notation on her education clearinghouse transcript that says she violated CU Boulder's Sexual Misconduct Policy. Loulillian Watson should not have her entire life dictated by a single event that both parties agree was an accident and a mistake. CU Boulder should not have the power to erase the future of an innocent young woman who wants nothing other than to give back to her community in Mississippi simply because of an accident.

7.      Neither Ms. Watson nor Doe participated in the investigation. Neither Ms. Watson nor Doe responded to the initial investigative report. Neither Ms. Watson nor Doe testified during the hearing. Indeed, both Ms. Watson and Doe agreed that this incident was an accident. But Ms. Watson and Doe were ignored. Instead, the reputation of the CU Boulder football program took precedence and a young woman's life was effectively destroyed.

8.      In the Written Determination, the Hearing Officer refused to consider that this incident was nothing more than an accident, failing to apply CU Boulder policy and procedure that a Respondent is presumed not responsible. Ex. 1, § VII(A)(4)(f); Ex. 2, § VII(D)(1)(c).[3] The burden of proof is on the University. Ex. 2, §VII(D)(1)(c) ("The

---

[3] The Colorado Supreme Court recently discussed the similar presumption of innocence in *People v. Vanderpauye*, 530 P.3d 1214, 1227 (Colo. 2023): "The chief problem with the prosecution's position is that it assumes Vanderpauye's guilt (i.e., it assumes that Vanderpauye did what the prosecution accuses him of doing). *If,* as the prosecution alleges, Vanderpauye had sexual intercourse with L.S. while she was physically helpless and while he knew she was physically helpless and didn't consent, then he would have foreseen that she might wake up, catch him in the act, and confront him about it, and her accusation would not have startled him. But that's a big *if.* More importantly, it's an improper *if* because it contravenes the presumption of innocence. *If,* consistent with the presumption of innocence, we assume that Vanderpauye did nothing

university, and not the parties, holds both the burden of proof and the burden of gathering sufficient evidence to reach a Determination Regarding Responsibility for Sexual Misconduct."); *see also* Ex. 2, §VII(D)(1)(e).

9.      On the scale of mens rea, intentional acts are the highest level and hardest to prove. Mental state accident, mistake, negligence, gross negligence, recklessness, and knowing mens rea precede intentionally, in order. To find that Ms. Watson intentionally stabbed Doe, while presuming Ms. Watson not responsible, the University has the burden to prove by a preponderance a greater mental state than each lower mental state.

10.     In the Written Determination, the Hearing Officer failed to consider Doe's actions during the incident and equally failed to consider Doe's inconsistent statements to coaches and staff after the incident, ignoring the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

11.     In the Written Determination, the Hearing Officer failed to consider the multiple contradictions and inconsistent statements from the OIEC witness interviews, finding instead that "other witnesses interviewed by both police and the investigator substantially corroborated the same fact narrative." Ex. 9 at 5. This is simply untrue. *See*, *e.g.*, Exs. 20-26 (OIEC witness interview notes). The Hearing Officer failed to adequately determine the credibility of the parties and witnesses and the weight given to their statements and failed to explain why some witness statements were given more weight than others. Ex. 2, § VII(D)(1)(e) (The Hearing Officer determines "the credibility of parties and witnesses and the weight given to their statements, taking into consideration their means of knowledge, strength of memory and opportunities for observation, the reasonableness and unreasonableness of their statements, the consistency or lack of consistency of their statements, their motives, whether their statements are contradicted or

illegal and that he engaged in sexual intercourse with L.S. after she consented to it, then he would not have foreseen that she'd accuse him of rape and her accusation would have been quite startling to him."

supported by other evidence, any evidence of bias, prejudice or interest, and the person's manner and demeanor when providing statements."). The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

12.     In the Written Determination, the Hearing Officer found that Ms. Watson's "intent to stab is not at issue, only whether or not she actually stabbed Respondent is at issue." Ex. 9 at 6. As a result, the Hearing Officer completely failed to consider Doe's provoking actions, the probability that Ms. Watson was defending herself, or any similar discussion. The fact that Ms. Watson did not intend to "stab" Doe is not only relevant, but of great significance for the determination of responsibility and sanction. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

13.     In the Written Determination, the Hearing Officer listed "undisputed" facts that were, indeed, disputed. The Hearing Officer omitted several relevant facts, including that Doe was holding a pair of scissors and threatening to cut up Ms. Watson's purse. Ex. 17 at 33, 74, 120, 167. A pair of scissors were found at the scene, but not logged into evidence. Ex. 17 at 30, 71, 117, 164. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

14.     In the Written Determination, the Hearing Officer failed to properly make the required credibility determinations. Instead, the Hearing Officer simply discarded any evidence that Doe may have been motivated to be untruthful in his effort to appease his football coaches and protect his football career and simply found that Doe's motivation to be untruthful had little connection or bearing on the case. Ex. 9 at 7. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

15.     The Hearing Office placed no value on any of the credibility issues raised by Ms. Watson. Instead, the Hearing Officer discarded or ignored all of Ms. Watson's arguments with little or no discussion. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

16.     In the Written Determination, the Hearing Officer speculated that because a 911 call was placed, but disconnected, Ms. Watson must have stolen Doe's phone to purposely delay medical treatment. The Hearing Officer completely failed to consider any other explanations for the disconnected call, including Doe's actions and motivations for ending the call. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

17.     In the Written Determination, the Hearing Officer concluded, without explanation, that Ms. Watson purposely delayed Doe's medical treatment "until he agreed to her demands that he not call the police." Ex. 9 at 7. Yet witness statements, including statements from Doe himself, do not support this finding. *See*, *e.g.*, Exs. 27-29. The Hearing Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

18.     On appeal, the Appeal Board completely ignored most of Ms. Watson's arguments, refused to consider any new evidence, and summarily upheld the Hearing Officer's Written Determination with little explanation and multiple errors. Ex. 15. The Appeal Board ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

19.     The investigation in this case was flawed. The hearing was a sham. The Appeal was full of inconsistencies and virtually ignored. And the ultimate decision to expel Loulillian Watson was unfair and biased. The Court must undo this injustice.

**THE PARTIES**

20.     Plaintiff, Loulillian Watson ("Plaintiff"), is a citizen of the United States and a resident of the State of Colorado. Until her expulsion, Ms. Watson was enrolled as a full-time student at CU Boulder.

21.     Defendant, the University of Colorado at Boulder (CU Boulder), is the flagship public university for the State of Colorado and part of the University of Colorado system with its principal administrative offices in Denver, Colorado. CU Boulder is authorized, supervised, and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes.

22.     Defendant, the Board of Regents for the University of Colorado at Boulder, is the governing body of CU Boulder. It is composed of nine members and charged with the general supervision of the university and the exclusive control and direction of all funds and appropriations to the university, unless otherwise provided by law.

23.     Defendant, Dr. Justin Schwartz, ("Defendant Schwartz") is a natural person and, upon information and belief, a resident of the State of Colorado. Defendant Schwartz is the 12th chancellor of CU Boulder, joining the campus July 1, 2024. Defendant Schwartz acts as the chief executive and academic officer of the campus. Defendant Schwartz reports to the President of the University System and the Board of Regents. Defendant Schwartz is the direct supervisor of the CU Boulder OIEC. Defendant Schwartz is in the position to give Ms Watson the relief she seeks.[4]

24.     Kate Bauer ("Defendant Bauer") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Bauer was the Senior Investigator for the Office of Institutional Equity and Compliance (OIEC) at

---

[4] Former Chancellor for CU Boulder, Philip P. Distefano, was the Chancellor at the time Ms. Watson was investigated and expelled from CU Boulder. Opposing counsel informed Plaintiff's counsel that Defendant Schwartz is the proper Defendant in this case because he is in the position to give Ms. Watson the relief she seeks. Plaintiff reserves the right to substitute Mr. Distefano for Defendant Schwartz, if necessary.

CU Boulder and the Senior Investigator investigating the allegations against Loulillian Watson.

25.     Lance Carl ("Defendant Carl") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Carl was the Associate Athletic Director for Student Athlete Development and Alumni Relations for CU Boulder's football program.

26.     Emily Pfleghaar ("Defendant Pfleghaar") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Pfleghaar was the Associate Director of Support and Safety Measures at CU Boulder and assisted in investigating the allegations against Loulillian Watson.

27.     Ann Gushurst ("Defendant Gushurst") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Gushurst was the Hearing Officer assigned to preside over Loulillian Watson's case.

28.     Valerie Simons ("Defendant Simons") is a natural person and, upon information and belief a resident of the State of Colorado. At all times relevant herein, Defendant Simons was the Chief Compliance Officer and System Title IX Coordinator.

29.     Llen Pomeroy ("Defendant Pomeroy") is a natural person and, upon information and belief a resident of the State of Colorado. At all times relevant herein, Defendant Pomeroy was the Associate Vice Chancellor for the OIEC and Title IX Coordinator. Defendant Pomeroy signed and submitted the formal Complaint against Loulillian Watson.

30.     Regina Tirella ("Defendant Tirella") is a natural person and, upon information and belief a resident of the State of Colorado. At all times relevant herein, Defendant Tirella was the Senior Director of Support and Safety Measures and Deputy Title IX Coordinator. Defendant Tirella was the Chair of Sanctioning Board in Loulillian Watson's case.

31.     Daniel Easton ("Defendant Easton") is a natural person and, upon
information and belief a resident of the State of Colorado. At all relevant times herein,
Defendant Easton was the Program Director for Academic Success Initiatives and Coaching.
Defendant Easton was a member of the Sanctioning Board in Loulillian Watson's case.

32.     Holly Nelson ("Defendant Nelson") is a natural person and, upon information
and belief a resident of the State of Colorado. At all relevant times herein, Defendant Nelson
was the Director, Student Conduct & Conflict Resolution. Defendant Nelson was a member
of Sanctioning Board in Loulillian Watson's case.

33.     Lisa Potoka Jones ("Defendant Potoka Jones") is a natural person and, upon
information and belief a resident of the State of Colorado. At all relevant times herein,
Defendant Potoka Jones was Assistant Dean of Students, Office of the Dean of Students, CU
Colorado Springs. Defendant Potoka Jones was a member of the Appeal Board in Loulillian
Watson's case.

34.     Will Dewese ("Defendant Dewese") is a natural person and, upon information
and belief a resident of the State of Colorado. At all relevant times herein, Defendant
Dewese was Director of Adaptable Resolutions, Office of Equity, CU Anschutz and Denver.
Defendant Dewese was a member of Appeal Board in Loulillian Watson's case.

35.     Laura Emmot ("Defendant Emmot") is a natural person and, upon
information and belief a resident of the State of Colorado. At all relevant times herein,
Defendant Emmot was Director and Title IX Coordinator, Office of Institutional Equity, CU
Colorado Springs. Defendant Emmot was a member of Appeal Board in Loulillian Watson's
case.

**JURISDICTION AND VENUE**

36.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331,
specifically 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964 (42 U.S.C. ß 2000d), and
Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 *et seq*.,) as well as the

Fifth and Fourteenth Amendments of the United States Constitution. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

37.     Upon information and belief, Defendants have expressly waived immunity under the Eleventh Amendment of the Constitution of the United States for the state law claims presented in this action

38.     Doe filed a Notice of Injury by a Public Entity and an employee thereof pursuant to C.R.S. § 24-10-109. Ex. 3.

39.     This Court is the appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391 as the Defendants are residents of the state in which the district is located, and a substantial part of the events or omissions giving rise to this claim occurred in this district.

**FACTUAL ALLEGATIONS**

**I.      Background**

40.     Plaintiff, Loulillian Watson, was born and raised in the state of Mississippi. Ms. Watson grew up in Quitman County, a small, tight knit community located in the Mississippi Delta. As a black woman raised in a single parent family, Ms. Watson's connection with her family and community continues to drive her commitment to succeed academically. Ms. Watson's future goals include doing everything in her power to help her family and give back to her community.

41.     Loulillian Watson and John Doe met at Coahoma Community College in Clarksdale, Mississippi, prior to attending CU Boulder. The couple started dating in mid-2021.

42.     At CU Boulder, Ms. Watson was working toward a B.A. Degree in Speech, Language, and Hearing Sciences. She intended to graduate from CU Boulder and hoped to give back to the community that raised her. At the time, Ms. Watson was 5'1" and 118 pounds.

43.     Doe studied Sociology at CU Boulder. At the time, Doe was a 6'4", 232-pound outside Linebacker for the CU Boulder football team.

44.     Both Doe and Ms. Watson are committed to giving back to their community and have high hopes for their futures.

## II.     The Alleged Incident

45.     On February 2, 2022, Loulillian Watson and John Doe were at Doe's off campus apartment in Boulder. Doe requested Ms. Watson leave his apartment. Ms. Watson agreed and started to collect her belongings, including her wallet, purse, and other personal items.

46.     Doe believed some of the items Ms. Watson wanted to take were gifts from her to him. To persuade Ms. Watson to leave the disputed items, Doe took Ms. Watson's purse without permission, a purse Ms. Watson purchased herself that was her prized possession. Ms. Watson objected. Doe held the purse out of Ms. Watson's reach and refused to return it. Doe picked up a pair of scissors and threatened to destroy Ms. Watson's purse.

47.     Feeling threatened by the scissors, Ms. Watson picked up a small kitchen knife. Doe still refused to return Ms. Watson's purse. Ms. Watson attempted to grab the purse from Doe's hands, reaching upward, at times jumping, with one hand, and holding the knife still in her other hand, close to her side. Doe was accidentally cut by the small knife. *See* Ex. 16 (letter from Ms. Watson to the public defender describing the incident).

48.     The injury to Doe was not immediately discovered. Once it was discovered, Ms. Watson attempted first aid and suggested that Doe go to the hospital. Both Doe and Ms. Watson were concerned about what would happen if the police became involved. As black Americans from the South, they feared being misunderstood by police or worse. Neither knew what to do, but both understood that Doe needed medical treatment.

49.     Ms. Watson went with Doe to the hospital, walked him into the lobby, and helped him check in. Doe was taken away and did not have contact with Ms. Watson. Ms. Watson left the hospital after she learned Doe would be there for hours or even overnight.

50.     After Doe arrived at the hospital, Doe contacted his football coaches to say he would not be able to attend a mandatory team meeting. Doe was a starting athlete on the CU Boulder football team. *See* Ex. 8 at 19-20 (noting that BCH told the OIEC investigator that Doe contacted the training staff when he arrived at the hospital, but the contents of that conversation were redacted by the Boulder Police Department); *see also* Exs. 20-26 (OIEC interviews with CU Boulder football coaches and staff).

51.     In his initial conversations with CU Boulder football coaches and staff, Doe tried to cover up the truth about what happened by falsely telling his coaches that he has suffered an allergic reaction and/or had food poisoning. *See* Ex. 24 (OIEC interview of Witness 5); Ex. 23 (OIEC interview with Witness 4); Ex. 25 (OIEC interview with Witness 6). Doe did not know that he had signed a release allowing CU football coaches to view his medical records. CU football staff soon learned the truth about Doe's medical condition – Doe had a knife wound with a possible cut to an internal organ and required exploratory, laparoscopic surgery. The surgery was ultimately successful.

52.     Boulder Police came to the hospital to speak with Doe on February 3, 2022. Doe refused to provide any statement to Boulder Police. Ex. 8 at 6; *see also* Ex. 17 at 11. Boulder Police spoke with the doctor who treated Doe. The doctor explained that Doe suffered a 1.2-centimeter-wide laceration just below his rib cage. Ex. 17 at 11.

53.     Doe was released from the hospital on February 3, 2022. Doe contacted Ms. Watson and asked her to pick him up from the hospital.

54.     Shortly after Doe was released from the hospital, Doe met with CU football coaches and staff. Doe was unwilling to discuss the incident when asked for additional

details and informed them that he did not want to report the incident to anyone, including the police and the OIEC.

55.     Upon information and belief, CU football coaches and staff scared Doe into making a report by saying that the other party, Loulillian Watson, could make a claim against Doe weeks or months later and her report might ruin his football career at CU Boulder and professionally. CU football staff advised Doe to make a report against Ms. Watson to protect himself. *See*, *e.g.*, Ex. 21 (Witness 2, the Head Coach of the CU Boulder football team, stated he advised Doe "to report in case the situation 'circled back' in a month or two and [Doe] found himself as the accused party."); *see also* Ex. 8 at 25-27. CU football coaches and staff indicated that they had a good relationship with certain officers in the Boulder Police Department and they could help him. Ex. 21 at 3 (stating that Defendant Carl contacted Deputy Weinheimer directly to start the police reporting process); Ex. 17 at 27 (stating that Doe was only willing to speak to Deputy Weinheimer).

56.     Doe spoke with Boulder Police over the phone. Ex. 8 at 6-9; Ex. 17 at 68-70. Defendant Carl was present during Doe's conversation with police. Ex. 8 at 7; Ex. 17 at 68. The conversation was recorded. Ex. 17 at 68. A voice other than Doe can be heard whispering to Doe.

57.     The narrative Doe provided to the Boulder Police Department mirrored the narrative Defendant Carl provided to the OIEC. *Compare* Ex. 17 at 11 *with* Ex. 20 at 2.

58.     Defendant Carl initially contacted the OIEC to report the incident on February 3, 2022. *See* Ex. 31 at 4; *see also* Ex. 8 at 4, 20, n. 10.

59.     The version of events that both Defendant Carl and Doe provided on November 3, 2022 were substantially similar to the facts the Hearing Officer relied upon in the Written Determination. Notably, however, this version of events contained multiple discrepancies from the narratives of other witnesses, including subsequent narratives provided by Doe. *See* Exs. 27, 28, 29 (State Public Defender interviews of Doe); *see also* Ex.

30; Exs. 21-26 (OIEC witness interview); Ex. 30 (State Public Defender interview of Ms. Watson's friend).

60.    Upon information and belief, Doe was encouraged by CU football staff to say Ms. Watson committed a crime when she attacked him with a knife and told to exclude true information about Doe's provoking actions, his violence against Ms. Watson, and the accidental nature of the actual events. This encouragement by CU football staff was designed to protect Doe from any consequences, specifically domestic violence charges that could end his football career at CU Boulder and professionally.

61.    Upon information and belief, CU Boulder football staff were aware their jobs were in serious jeopardy, based on the team's record, and were aware that losing their starting defensive end would harm their ability to succeed in the coming season. CU Boulder football staff knew that, without success, CU Boulder would fire their head coach, and many others would likely lose their jobs as well.

62.    Later that day, Boulder Police searched Doe's apartment with Doe's consent. Doe was present. The knife was not found. A pair of scissors was observed, but not logged into evidence. Ex. 8 at 11-12; Ex. 17 at 12, 29-30.

63.    Later that evening, Boulder Police Department contacted Ms. Watson at her residence. Ms. Watson was scared. Ms. Watson had no police record before this incident. Ms. Watson told Boulder Police multiple times that the incident was an accident. Ms. Watson explained that Doe had her bag and was threatening to cut it up with scissors – in one hand, Doe held the bag, and in the other, a pair of scissors. Ex. 8 at 17; Ex. 17 at 33. Ms. Watson explained that Doe accidentally leaned into the knife when she tried to grab her bag from him. Ms. Watson told police that she attempted first aid and went to the hospital with Doe when they realized that the wound was serious. Ex. 8 at 17; Ex. 17 at 34.

64.    Growing up in rural Mississippi, Ms. Watson did not believe she could trust police. She wanted to protect Doe. She misunderstood the OIEC resolution process and

possible criminal liability. She loved Doe and still does. Ms. Watson feared Doe would lose

his football career both at CU and professionally if she spoke the truth. Ms. Watson tried not

the speak with police officers, but in her effort to protect Doe, Ms. Watson ultimately made

statements that shed a negative light on her.

65.     On February 8, 2022, Boulder Police arrested Ms. Watson at her on campus

apartment. Ms. Watson was led out of her apartment in handcuffs in front of her peers. Ms.

Watson was charged with First Degree Assault, Felony Menacing, and Obstruction of

Telephone Service, all with a Domestic Violence Enhancer. *See* Ex. 17 at 51.

66.     This case required a thorough, independent, fair, complete, and unbiased

resolution process to uncover the full truth. CU Boulder did not conduct a thorough,

independent, fair, complete, and unbiased resolution process. The Hearing Officer,

Sanctioning Board, and Appeal Board failed to apply the presumption of not responsible

and the University's burden of proof.

### III.    CU Boulder's Sexual Misconduct Policy and OIEC Resolution Procedures

67.     In recent years, there has been substantial criticism of CU Boulder's handling

of sexual misconduct investigations. Indeed, referencing CU Boulder's effectiveness in

investigating complaints submitted to the OIEC, a CU Boulder Law professor called the OIEC

a "joke" and stated that the OIEC "is basically a Potemkin process or setup for the purpose

of running cover for the university's central administration."[5]

68.     CU Boulder's OIEC handles sexual misconduct complaints for CU Boulder

under the Sexual Misconduct, Intimate Partner Violence, and Stalking Policy and the OIEC

Resolution Procedures 2021-2022. Ex. 1. ("CU Boulder Policy" or "Sexual Misconduct

---

[5] *See, e.g.*, Olivia Doak, *CU Boulder elects not to investigate hundreds of discrimination, harassment complaints*, Daily Camera, Aug. 27, 2024, https://www.dailycamera.com/2024/08/26/cu-boulder-elects-not-to-investigate-hundreds-of-discrimination-harassment-complaints/?clearUserState=true. The article went on to say that many professors at CU Boulder "don't have trust" in the administration. In fact, "[m]ore than half a dozen professors declined to speak to the Daily Camera on the record or anonymously about their experience with the OIEC, most citing fear of retaliation or other professional consequences."

Policy"); Ex. 2 ("OIEC Resolution Procedures"). CU Boulder Policy requires the university to address allegations of sexual misconduct "in a manner that ensures all parties receive prompt, fair, and equitable treatment and that safeguards the dignity and rights of all involved." Ex. 1, § I. The Policy mandates that CU Boulder provide "fair and equitable processes to investigate and address complaints" of sexual misconduct "that provide fundamental due process." *Id*. § II.

69.     CU Boulder Policy prohibits sexual misconduct, including dating violence, whether the conduct is specifically prohibited by Title IX or conduct that falls outside of Title IX's jurisdiction. Ex. 1, § III. The OIEC Resolution Procedures are intended to be the formal resolution procedures for CU Boulder Policies, including the Sexual Misconduct Policy, and govern how the OIEC will administer and enforce the Policy. Ex. 2, § II(B)(1).

70.     As applicable here, CU Boulder Policy defines dating violence as "violence committed by a person, on the basis of sex – 1. who is or has been in a social relationship of a romantic or intimate nature with the victim; and 2. where the existence of such a relationship shall be determined based on a consideration of the following factors: a. The length of the relationship; b. The type of relationship; and c. The frequency of interaction between the persons involved in the relationship." Ex. 1, § IX(C).

71.     CU Boulder Policy applies to all students and applies to "conduct that occurs in an *education program or activity* of the university, or if the *complainant* or *respondent* are affiliated with the university community. This includes off-campus conduct, including online and electronic conduct." Ex. 1, § IV(A)(2). Alleged conduct may be considered either Title IX Sexual Misconduct or Sexual Misconduct, depending on an arbitrary determination of jurisdictional requirements.

72.     According to CU Boulder Policy, Title IX Sexual Misconduct applies to conduct "that occurs in an *education program or activity* against a person in the United States," and in these cases, the Title IX Coordinator must utilize the Title IX Sexual Misconduct

procedures prescribed by the Title IX Regulations. *Id.* § IV(A)(2)(a). In contrast, CU Boulder's Sexual Misconduct, "[a]pplies to conduct that does not otherwise meet the jurisdictional standard or definition of Title IX Sexual Misconduct, but . . . where both the *complainant* and *respondent* are affiliated with the university." *Id.* § IV(A)(2)(b)(ii).

73.     If, as here, the Title IX coordinator determines that the alleged conduct does not meet the jurisdictional standard or definition of Title IX Sexual Misconduct, but both the complainant and respondent are affiliated with the university, CU Boulder Policy authorizes the Title IX Coordinator to arbitrarily determine whether the alleged conduct falls under Title IX Sexual Misconduct or whether the university has jurisdiction to take action pursuant to CU Boulder's Sexual Misconduct Policy. *Id.* § IV(A)(2).

74.     Here, the Notice of Allegations states the following: "In this instance, both Complainant and Respondent are University of Colorado (CU Boulder) undergraduate students, and the allegations include sexual misconduct pursuant to the Policy. Therefore, the university has jurisdiction to investigate these allegations pursuant to Section IV(A)(2)(b)(i)." Ex. 6 at 1. The Notice of Allegations does not provide an explanation for why the Title IX Coordinator determined that the allegations did not fall under Title IX jurisdiction. The facts here show extensive interplay with the most visible CU Boulder program, its football team, including the athletic directors' office, coaches, and staff.

75.     To initiate the grievance process in cases of alleged sexual misconduct that do not fall under Title IX jurisdiction, either the complainant or Title IX Coordinator must file and sign a formal complaint. The complainant may or may not be a member of the university community. *Id.* § IV(A)(4)(b).

76.     Whether bringing allegations of Title IX Sexual Misconduct or Sexual Misconduct, CU Boulder is required to follow the Resolution Process set forth in the OIEC Resolution Procedures. Ex. 2, § VII(D). According to the OIEC Mission Statement, the "OIEC utilizes fair and unbiased processes and treats all individuals . . . with respect and dignity."

*Id*. § I. In the context of sexual misconduct, the OIEC Resolution Procedures express a
commitment "to providing prompt, fair, impartial and equitable resolutions" of complaints.
*Id.* § VII.

77.     The OIEC resolution process must be conducted by "trained officials who do
not have a conflict of interest or bias for or against the complainant or respondent, or
against complainants or respondents generally." *Id*. § VII(D).

78.     The formal grievance process includes five major stages: (1) filing and
evaluation of the formal Complaint; (2) investigation; (3) dissemination of the investigative
file and investigative reports; (4) hearing and determination regarding responsibility
(including sanction, if application); and (5) appeal, as applicable. *Id*. § VII(D)(1).

79.     The OIEC Resolution Procedures state that CU Boulder may dismiss a formal
complaint at any time prior to the hearing "if the respondent is no longer enrolled or
employed at the university" or "if specific circumstances prevent the university from
gathering evidence sufficient to reach a determination" about the complaint or the
allegations ("discretionary dismissal"). *Id*. § VII(D)(1)(b).

80.     If the Formal Grievance Process is commenced, the respondent and
complainant receive a written Notice of Allegations. After the Notice of Allegations has been
issued, "the OIEC's investigator(s) will seek to obtain all available evidence directly related
to the allegations at issue." This may include conducting interviews with parties and
witnesses, obtaining university records, and collecting other documentation, such as police
reports, emails, text messages, etc. *Id*. § VII(D)(1)(c).]CU Boulder Policy and OIEC
Resolution Procedures mandate an investigative process where the university, and not the
parties, holds both the burden of proof and the burden of gathering evidence sufficient to
reach a determination regarding responsibility. Ex. 1 § VII(B); Ex. 2, § VII(D)(1)(c).

81.     CU Boulder Policy and OIEC Resolution Procedure mandate an investigative
process where the university provides the parties an equal opportunity to present

witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence. Both parties must also be provided with an equal opportunity to inspect and review any evidence obtained as part of the investigation, including evidence that the university does not intend to rely upon in reaching a determination, so that each part can meaningfully respond to the evidence prior to the conclusion of the investigation. Ex. 1, § VII(B); Ex. 2 § VII(D)(1)(c).

82.     As part of the grievance process, and with the relevant party's voluntary, written consent, the university may utilize records made or maintained by a physician, psychiatrist, or psychologist. Ex. 1, § VII(B); Ex. 2 § VII(D)(1)(c).

83.     Prior to the completion of the investigative report, CU Boulder must send each party the evidence subject to inspection and review. Ex. 1, § VII(B)(7). The preliminary investigative report includes a written summary of relevant and material evidence, as determined by the OIEC investigator. The parties have at least 14 days to submit a written response. Ex. 2, § VII(D)(1)(d). The investigator must consider the evidence submitted in the written response prior to the completion of the investigation. Ex. 1, § VII(B)(7).

84.     CU Boulder must create an investigative report that "fairly summarizes the relevant evidence without reaching any findings of fact or conclusions" and provide the report to each party prior to the hearing. Ex. 1, § VII(B)(8). The final investigative report includes a written summary of relevant and material evidence, as determined by the OIEC investigator, and must incorporate the parties' responses to the preliminary investigative report. Ex. 2, § VII(D)(1)(d).

85.     It should be noted that while the CU Boulder will appoint an advisor for a Respondent like Ms. Watson, they will not appoint the advisor prior to the scheduled hearing. Ex. 2, § VII(D)(1)(e). This means that Respondents like Ms. Watson do not have any help deciding whether to supply evidence or whether to make a statement to the OIEC.

Respondents like Ms. Watson do not fully understand the possible sanctions and do not know what defense should be presented until the evidence is already closed.

86.     The factual findings and final determination regarding responsibility is made by the hearing officer only after a live hearing, including the opportunity for cross-examination. *Id.*

87.     At the hearing, the hearing officer is responsible for maintaining an orderly, fair, and respectful hearing. Ex. 1, § VII(C)(6).

88.     CU Boulder Policy states that each party may bring one advisor of their choosing to the hearing to conduct cross-examination, with prior notice to the university that the advisor will attend. Ex. 1, § VII(C)(1).

89.     CU Boulder Policy requires the Hearing Officer to permit each party's advisor to ask the other party and any witness all relevant questions and follow-up questions, including those challenging credibility. Ex. 1, § VII(C)(7).

90.     CU Boulder Policy states that a party advisor may only ask a party or witness relevant questions, defined as a question that "seeks information that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the information sought in the question." Before the complainant, respondent, or witness answers a cross-examination or other questions, the hearing officer must first determine whether the question is relevant and explain any decision to exclude the question. Ex. 1, § VII(C)(8).

91.     CU Boulder Policy states that the hearing officer cannot draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions. This can be a factor when determining whether the university has met its burden of proof. The hearing officer may consider any relevant prior statement of a party or witness,

whether they submit to cross-examination at the live hearing or not, and the hearing officer decides how much weight to give prior statements. *Id.* § VII(C)(10).

92.     CU Boulder Policy states that the hearing officer must apply the preponderance of the evidence standard when making findings of fact and conclusions.[6] A preponderance of the evidence exists when the totality of the evidence demonstrates that an allegation is more probably true than not. If the evidence weighs so evenly that the hearing officer is unable to say that there is a preponderance on either side, the hearing officer must determine that there is insufficient evidence to conclude that there has been a violation of the Policy. *Id.* § VII(C)(11).

93.     The hearing officer must issue a written determination regarding responsibility and provide the determination to the parties simultaneously. The hearing officer must include the disciplinary sanction in the written determination, as determined by the sanctioning board. *Id.* § VII(C)(12), (13), (15).

94.     According to OIEC Resolution Procedures, the Hearing Officer determines "the credibility of parties and witnesses and the weight given to their statements, taking into consideration their means of knowledge, strength of memory and opportunities for observation, the reasonableness and unreasonableness of their statements, the consistency or lack of consistency of their statements, their motives, whether their statements are contradicted or supported by other evidence, any evidence of bias, prejudice or interest, and the person's manner and demeanor when providing statements." Ex. 2, § VII(D)(1)(e).

95.     According to OIEC Resolution Procedures, possible sanctions available upon a finding of responsibility include, but are not limited to, warning/written reprimand, educational sanctions, formal disciplinary probation, restriction or denial of university

---

[6] A minimum standard of "clear-and-convincing" should be required for expulsion due to the quasi-criminal nature of the charges and the significant lifetime consequences of the sanction.  The Title IX Regulations define the clear-and-convincing-evidence standard as meaning the decision-maker must determine whether it is "highly probable" that the alleged facts are true.

services, delayed conferral of diploma or degree, suspension, exclusion, and expulsion. Ex.
2, § VII(D)(1)(e)(i).

96.     Expulsions are rare in cases concerning intimate partner violence that are
subject to OIEC Policy and Resolution Procedures. *See* Ex. 18; Ex. 19. Expulsion requires a
student to permanently leave the university and includes an automatic exclusion from
University of Colorado property. An expulsion decision results in the student being expelled
from all campuses in the University of Colorado system. Importantly, a notation of "Expelled
Responsible Sexual Misconduct" remains ***permanently*** on a student's transcript. Ex. 2, §
VII(D)(1)(e)(i).

97.     CU Boulder Policy permits either party to appeal a determination regarding
responsibility. Both parties must have a reasonable, equal opportunity to submit a written
statement in support of, or challenging, the outcome. The decision-maker for the appeal
(Appeal Board) must not be the same hearing officer that reached the determination
regarding responsibility, investigator(s), or the Title IX Coordinator. The decision-maker for
the appeal must be trained. The appeal decision-maker (Appeal Board) must issue a
written decision describing the result of the appeal and the rationale for the result and the
written decision must be provided simultaneously to both parties. Ex. 1, § VII(D); Ex. 2, §
VII(D)(1)(f).

98.     According to CU Boulder's *Student Respondent Statistical Report*, in fiscal year
2021-2022, the OIEC received 41 allegations of dating or domestic violence. Ex. 18 at 7. Of
those 41 allegations, 37 were addressed through remedies-based or other resolutions, and
only ***three*** of the 41 allegations, including this case, were addressed through a formal
grievance process. At the time the report was published, one of the three cases had resulted
in a "Not Responsible" finding and two were still in progress, including this case. *See* Ex. 18

at 7. At the time of the report, the OIEC had issued **_zero_** expulsions for sexual misconduct, including dating violence, in fiscal year 2021-2022.[7] Ex. 18 at 8.

99.    Similarly, in fiscal year 2022-2023, the OIEC received 31 allegations of dating or domestic violence. Ex. 19 at 6. Of those 31 allegations, 27 were addressed through remedies-based or other resolutions, and only four of the 31 allegations were addressed through a formal grievance process. At the time the report was published, only **_two_** cases were resolved through a "Responsible" finding that resulted in a sanction, including this case. While the 2022-2023 report fails to specify which sanction was applied in these two cases, *see* Ex. 19 at 6, one of the two cases resolved through a "Responsible" finding was Ms. Watson's case and Ms. Watson's sanction was expulsion. *See* Ex. 11 (Sanction Letter, dated August 4, 2022); *see also* Ex. 15 (Appeal Decision, dated October 19, 2022, upholding the sanction of expulsion).

### IV.    The Investigation and Hearing

100.    On February 9, 2022, Title IX Coordinator Defendant Pomeroy filed a Formal Complaint against Loulillian Watson pursuant to CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy. Ex. 5.

101.    On the same day, CU Boulder's OIEC issued Ms. Watson a Notice of Allegations and Interim Suspension. Ex. 6. The Notice was signed by Defendant Bauer, Senior Investigator. The Notice was delivered to Ms. Watson at the Boulder County Jail.[8] The Notice informed Ms. Watson that she was being investigated for possible violations of CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy, specifically Dating

---

[7] As far as sanctions pursuant to the CU Boulder's Sexual Misconduct Policy, in fiscal year 2021-2022, the OIEC issued zero expulsions, three suspensions, four exclusions from all or specific areas of campus, two disciplinary holds, and four behavioral assessments. Ex. 18 at 8.
[8] In Ms. Watson's criminal case, the District Attorney treated Ms. Watson more fairly, with an opportunity to prove she did not deserve lifelong consequences. Ms. Watson accepted a deferred sentence which was sealed after successful completion of Boulder 2022CR000195.

Violence. The Notice stated that Ms. Watson was "presumed not responsible for the alleged conduct" at that time.

102.    The Notice of Allegations and Interim Suspension also stated that Defendant Pfleghaar had determined that Ms. Watson 's presence on campus posed an "immediate threat" and informed Ms. Watson of an interim suspension, effective immediately. Ex. 6 at 2; *see also* Ex. 4 (Safety Assessment and Risk Analysis for Emergency Removal of Individuals, completed by Defendant Tirella on February 8, 2022).

103.    Ms. Watson did not ask for an advisor. But even if she had requested an advisor, the advisor would not have been appointed until evidence was closed and therefore an advisor would only be able to help her during the hearing. All evidence must be submitted prior to CU Boulder issuing the Final Investigative Report (FIR). CU Boulder will not appoint an advisor until after the FIR. Counsel represented Ms. Watson pro bono after consulting with Ms. Watson's public defender. This did not occur until after the FIR. Counsel requested more time to provide evidence and investigation, but the request was denied.

104.    The OIEC investigation lasted less than a month – from February 14, 2022 until March 10, 2022. The OIEC investigation was led by Senior Investigator, Defendant Kate Bauer. Defendant Pfleghaar assisted with the investigation.

105.    Neither Loulillian Watson nor John Doe participated in interviews with the OIEC regarding the incident.

106.    The OIEC interviewed seven witnesses. *See* Exs. 20-26. All seven witnesses were affiliated with CU Boulder and/or CU Boulder's football program, including Defendant Carl. Two potential witnesses – Doe's older brother and Ms. Watson's roommate in her on-campus residence hall – were unresponsive to OIEC's interview request. Ex. 8 at 3.

107.    As part of the investigation, the OIEC heavily relied upon the Boulder Police Department report related to the incident on February 2, 2022. Ex. 17.  OIEC failed to

provide a fair and equitable investigation by not obtaining the entire police file, including body worn camera video that provided the tone and context of witness statements.

108.    As part of the investigation, the OIEC also relied on their own unrelated case file concerning a March 2021 situation involving both Ms. Watson and Doe.

109.    Neither Ms. Watson nor Doe provided any information or documentation to the OIEC during the investigation.

110.    On April 12, 2022, the OIEC issued a Preliminary Investigative Report (PIR) and investigative file to both Ms. Watson and Doe. Ex. 7. Neither Ms. Watson nor Doe provided a response to the PIR.

111.    On April 28, 2022, the OIEC issued a Final Investigative Report (FIR) and investigative file to both Ms. Watson and Doe. Ex. 8. Neither Ms. Watson nor Doe provided a response to the FIR.

112.    On June 8, 2022, A Notice of Hearing was sent to both Ms. Watson and Doe as well as any witnesses identified by the parties.[9]

113.    On June 14, 2022, a Pre-Hearing Conferences was conducted the Hearing Officer, Defendant Gushurst.

114.    On June 17, 2022, a hearing was held before Defendant Gushurst for the purpose of cross-examination of the witnesses.

115.    Ms. Watson appeared represented by a pro bono advisor. Doe did not appear, but his appointed advisor appeared. Neither Ms. Watson nor Doe testified at the hearing. At the time, Ms. Watson's criminal case based on the same facts had not been completed and Ms. Watson chose to exercise her right to remain silent under Colorado and federal Constitutional law.

---

[9] Plaintiff's request for witnesses was not timely submitted. As a result, neither Doe nor Defendant Carl appeared at the hearing. In fact, other than Defendant Bauer, the Senior Investigator in this case, no other witness appeared at the hearing.

116.    CU Boulder's Sexual Misconduct Policy states that "[e]ach party may bring one advisor of their choosing to the live hearing to conduct cross-examination, with prior notice to the university that the advisor will attend and the advisor's name." Ex. 1, § VII(C)(1). Defendant Bauer was not a "party." Defendant Bauer was the Senior Investigator on this case.

117.    The only witness that appeared at the hearing was Defendant Bauer, who was represented by a lawyer from CU Boulder's general counsel's office. Upon information and belief, Defendant Bauer's lawyer stifled full answers to cross examination and proper discussion of the facts. It is the University's burden to produce evidence sufficient to make a finding. Ex. 2, § VII(D)(1)(c). Here, CU Boulder's general counsel prevented Ms. Watson's attorney from presenting evidence. Applying the burden of proof and presumption of not responsible, this factor must weigh in favor of insufficient evidence to make a finding of responsibility.

118.    Neither Defendant Carl nor any of the other witnesses interviewed about the incident appeared at the hearing. Witnesses that are CU Boulder students or employees are encouraged to participate so the truth may be found at a hearing. The failure of the football staff to appear, combined with their significant involvement in the first report by Doe, must be considered as part of the credibility assessment.

119.    The Written Determination Regarding Responsibility, dated July 22, 2022, and signed by Defendant Gushurst, found Ms. Watson responsible for violating CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy. Ex. 9; *see also* Ex. 10 (Notice of Written Determination, dated August 4, 2022).

120.    In the Written Determination, the Hearing Officer described "undisputed" facts that were, in fact, disputed. For example, the Hearing Officer stated that Ms. Watson "made jabbing motions" towards Doe. This is a disputed fact. The "jabbing" motions are suggestive of an intentional mental state. Ms. Watson and Doe say the cut was caused by

accidental contact with Doe. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

121.    In the Written Determination, the Hearing Officer omitted "undisputed" facts that were, in fact, undisputed. For example, the Hearing Officer omitted any mention of the scissors that Doe was holding when he threatened to cut up Ms. Watson's purse. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

122.    In the Written Determination, the Hearing Officer completely disregarded Ms. Watson's version of events and Ms. Watson's argument that Doe was not truthful and had strong motivations to control the narrative of this incident. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

123.    In the Written Determination, the Hearing Officer completely disregarded facts that were supportive of Ms. Watson, including Doe's provocation with scissors, Ms. Watson's attempts at first aid, Ms. Watson's attempts at first aid, and that Ms. Watson went to the hospital with Doe. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

124.    In the Written Determination, the Hearing Officer found Doe's version of events credible despite Doe's multiple lies to coaches and medical staff. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

125.    In the Written Determination, the Hearing Officer failed to adequately make any credibility determinations, as indicated by CU Boulder Policy. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

126.    In the Written Determination, the Hearing Officer found that Ms. Watson's "intent to stab is not at issue," despite evidence in the record showing that the entire incident was an accident. Instead, the Hearing Officer determined that "only whether or not she actually stabbed" Doe was at issue. The Hearing Officer found that Ms. Watson

"stabbed" Doe and that was all that mattered. Mitigating circumstances did not matter. The language used is language of intentional conduct. The Hearing Officer found the mental state of intentional, while indicating otherwise and refused to consider the lower mental state of accident. It must be assumed that a person could be cut by a knife held by an intimate partner without the person holding the knife violating the Sexual Misconduct Policy. For example, if a partner is cutting vegetables at the counter and the other person comes up to give a hug, but in the innocent circumstance of this unexpected action, they are cut, a finding that mental state is "immaterial" provides grounds for the absurd result of a victim of sexual assault being responsible.

127.    In the Written Determination, the Hearing Officer found that there was "some dispute about" whether Ms. Watson took Doe's phone and delayed medical treatment. Yet, with absolutely no support or evidence, the Hearing Officer unreasonably determined that Ms. Watson took Doe's phone for the specific purpose of delaying medical treatment. Indeed, the only evidence the Hearing Officer cited in support of the finding was a disconnected 911 call. The Hearing Officer failed to apply the University's burden of proof and presumption of not responsible.

128.    On the same day as the Notice of Written Determination, the Sanctioning Board issued Ms. Watson a Sanction Letter, dated August 4, 2022 and signed by Defendant Tirella, Defendant Easton, and Defendant Nelson. Ex. 11. The Sanction Letter informed Ms. Watson that she was permanently expelled from CU Boulder and excluded from all University of Colorado Campuses. The Sanctioning Board failed to apply the University's burden of roof and the presumption of not responsible.

**V.     The Appeal**

129.    Ms. Watson submitted a timely Appeal on August 24, 2022. Ex. 13; Ex. 14.

130.    The Appeal presented new evidence that was unavailable during the initial investigation, including an impact statement from Doe, dated August 7, 2022. *See* Ex. 12.

Doe's impact statement was especially relevant considering the Sanctioning Board's assessment finding that the impact of the incident on Doe was "high." Ex. 11 at 2. Doe's impact statement says otherwise and specifically states that the injury had "minimal effects" on Doe and CU Boulder's decision to expel Ms. Watson was "excessive" and should be reconsidered. Ex. 12 at 1.

131.    The Appeal presented new evidence obtained from police body camera recordings, evidence the OIEC failed to collect during the investigation. As part of the investigation, the OIEC relied solely on written police reports. This new evidence strongly supports Ms. Watson's assertion that witnesses may have encouraged Doe to falsely report the incident to protect both his academic aspirations and potential career in professional football. Ex. 13 at 2-3.

132.    The Appeal presented new evidence that Ms. Watson enrolled and attended domestic violence classes, information provided to the Sanctioning Board, but not completed until after Ms. Watson's expulsion. Ex. 13 at 3.

133.    The Appeal asserted due process errors, including failure to provide a fair hearing that included cross examination of the witnesses, failure to apply the correct standard of proof, incorrectly applying the burden of production, failure to properly assess credibility, and multiple other due process errors. Ex. 13 at 3-8.

134.    The Appeal asserted that the OIEC investigators had a conflict of interest and exhibited unfair bias that materially affected the outcome of the investigation, demonstrated by the OIEC's failure the investigate or address Doe's code violations and Defendant Bauer's representation by CU Boulder's general counsel. Ex. 13 at 8-9.

135.    The Appeal Decision dated October 19, 2022, and signed by Appeal Board Members, Defendant Potoka Jones, Defendant Dewese, and Defendant Emmot, upheld the Written Determination and Sanctions in their entirety. Ex. 15. The Appeal Board failed to apply the University's burden of proof and the presumption of not responsible.

136.    The Appeal Decision contained multiple errors and either completely ignored or gave de minimus consideration to most, if not all, of Ms. Watson's assertions in the Appeal.

137.    For example, the Appeal Decision wrongly states that the Hearing Officer's Written Determination was based on Witness 5's statement to Boulder Police Department. Ex. 15 at 8. However, Witness 5's statement is neither relevant to nor referenced in the Written Determination. Indeed, Witness 5's statement primarily discusses Doe's initial lies to staff and coaches about his condition. *See* Ex. 24.

138.    Yet another error occurs in the Appeal Board's finding concerning conflict of interest and unfair bias. Ex. 15 at 9. Here, in responding to Ms. Watson's assertion concerning failure to investigate in this case, the Appeal Board states that Ms. Watson "met with the OIEC investigator on this case on March 23, 2021 and indicated she did not wish to provide any information to the investigator . . . ." Ex. 15 at 9. However, this date references a prior unrelated situation from March 2021 and not the incident that occurred on February 2, 2022. The Appeal Board used this statement to simply discard any evidence that Ms. Watson's statements concerning Doe's actions and threats against her were relevant to the case. Ex. 15 at 9 ("While there was information in the file that Respondent told [Boulder Police Department] that Complainant took Respondent's purse, threatened her purse (which she equated to threats against her) and 'threatened' her, there was no more information available . . .").

139.    Moreover, the Appeal Board found that Defendant's Bauer's appearance at the Hearing with an advisor, specifically CU Boulder general counsel, was completely normal and not a conflict of interest or bias because the "hearing manual specifically states that witnesses may appear with counsel." Ex. 15 at 10 (notably, without citing to any source, including a hearing manual). While it is true that a ***party*** "may bring one advisor of their choosing . . . with prior notice," *see* Ex. 1, § VII(C)(1); *see also* Ex. 2, § VII(D)(1)(e), the same

is not true for a Senior Investigator, who is not a party in the case, especially without any notice to the parties.

140.    The Appeal Board did not allow new evidence, including a statement of mitigation provided by Doe that was not reasonably available at the time of the Determination of Responsibility. Ex. 12; *see also* Ex. 2 (including as a basis for appeal "new evidence that was not reasonably available at the time of the Determination"). According to the Appeal Decision, the impact statement provided by Doe was not new evidence because Doe could have submitted it previously, a very strict interpretation of the rule. The University applied this rule very differently on February 15, 2023, when Deputy Title IX Coordinator Megan Clark failed to analyze an objection to an appeal based on "new evidence" submitted by a Complainant that could have submitted prior to the Determination in that case.[10]  There, the "new evidence" cited for the decision consisted solely of the thoughts and feelings of the Complainant, and nothing else. Complainant did not provide any argument for why this evidence was new or was not reasonably available prior to the Determination. There was no finding by the University. Respondent objected to no avail. The dismissed case was reinstated after appeal and is currently awaiting resolution by a hearing officer.

141.    These examples, among others, demonstrate that the Appeal Board did not take this case seriously, failed to review evidence, and simply rubber stamped the Hearing Officers Written Determination. The Appeal Board failed to apply the University's burden of proof and the presumption of not responsible. Ms. Watson deserves better and the law demands it.

---

[10] *NS v. BS*, Case No. 00083444, *Objection to the Granting of Complainant's Appeal and Request to Reinstate Dismissal Based on Deputy Title IX Coordinator Using the Wrong Resolution Procedure and Complainant's Failure to Comply with Appeal Rules on New Evidence.*

## CLAIM I

## (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION)

142.    Plaintiff repeats and incorporates all of the allegations of this Complaint as if fully set forth herein

143.    This Count is brought against all Defendants

144.    The Fifth Amendment to the United States Constitution, made applicable to the State of Colorado by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law.

145.    The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

146.    The Due Process clauses of the United States Constitution are implicated by higher education disciplinary decisions, including the disciplinary decisions under CU Boulder's Sexual Misconduct Policy and OIEC Resolution Procedures.

147.    Plaintiff is entitled, under the Constitution of the United States, to the opportunity to be heard in a meaningful manner by CU's Office of Institutional Equity and Compliance (OIEC) the Hearing Officer, the Sanctioning Board, and the Appeal Board, as required by CU Boulder Policy and OIEC Resolution Procedures.

148.    Ms. Watson's interest in the outcome of the investigation and adjudication is significant, and including the following:

    a.   Expulsion from CU Boulder denied Plaintiff the benefits of education at her chosen school.

    b.   Expulsion damaged and continues to damage Plaintiff's academic and professional reputation.

    c.   A finding of responsibility damaged and continues to damage Ms. Watson's personal reputation.

      d.   Ms. Watson's expulsion impairs her ability to pursue higher educational and career prospects.

149.    In the course of CU Boulder's investigation and adjudication, CU Boulder flagrantly violated Plaintiff's clearly established rights under the Fifth and Fourteenth Amendments through its deprivation of the minimal requirements of procedural fairness and unfair bias. Without limitation, such acts included the following:

      a.   Failure to apply the University's burden of proof and the presumption of not responsible;

      b.   Failure to provide a fair, equitable and impartial resolution, as stated in the OIEC Resolution Procedures;

      c.   Failure to provide a hearing with cross examination of witnesses, including "Complainant," John Doe;

      d.   Failure by investigators to collect police body camera recordings and the full police investigative file, which was available from the Boulder Police Department in mid-February 2022;

      e.   Permitting Defendant Bauer, the Senior Investigator, to be represented at the Hearing by CU Boulder general counsel;

      f.   Failing to afford any weight to Plaintiff's version of events;

      g.   Failing to consider Doe's motivations to tell police something other than the truth;

      h.   Failure by the Hearing Officer to accurately state disputed and undisputed facts;

      i.   Failing to consider evidence that Doe feared retaliation from the CU Boulder football coaches and staff if the truth about the incident came out

      j.   Failing to consider evidence that Doe followed the advice of CU Boulder football coaches and staff because he feared potential consequences for

his actions, including his football career at CU and his future football
career;

k. Prejudicing Plaintiff by considering a previous situation from March 2021
that was not fully investigated and suffered from similar motivations by
Doe and others;

l. Allowing the Hearing Officer to draw an adverse inference about
Plaintiff's refusal to take part in the investigation or appear at the hearing
while failing to give any weight to the fact that Doe did not submit the
Complaint against Plaintiff and refused to take part in the investigation or
appear at the hearing;

m. Denying Plaintiff a fair hearing before an impartial and unbiased
decisionmaker;

n. Finding credible the version of events provided by CU Boulder football
staff and coaches and completely ignoring multiple conflicting statements
by CU Boulder football staff and coaches;

o. Failure to consider motivations of CU Boulder football staff and coaches to
encourage a false and incomplete narrative;

p. Issuing an unwarranted and lifelong sanction for an accident that Doe
stated did not cause him any lasting harm;

q. Failure to treat Ms. Watson the same as other similarly situated students;

r. Failure of the Appeal Board to fully and properly consider Plaintiff's
appeal;

s. Failure of the Appeal Board to consider new evidence, including Doe's
impact statement and police body camera recordings; and

t. Failure of the Appeal Board to credit Plaintiff's efforts to enroll and attend
in domestic violence classes.

150.    Plaintiff asserts that CU Boulder's Sexual Misconduct Policy and OIEC Procedures violate the Due Process clauses of the United States Constitution.

151.    Defendants have a duty to enforce and apply the provisions of CU Boulder's Sexual Misconduct Policy and OIEC Procedures in a fundamentally fair manner with a reliable process but have instead unfairly and inappropriately enforced and applied those policies and procedures against Ms. Watson.  The investigation, hearing, sanctions, and appeal were arbitrary and capricious. Defendants were aware of the investigation, hearing, sanction, and appeal against Ms. Watson and did nothing to correct the Constitutional shortcomings.

152.    Based on the foregoing, Ms. Watson is entitled to a declaration that the CU Boulder's Sexual Misconduct Policy and OIEC procedure, as applied to her, violates the Due Process clauses of the United States Constitution.

153.    As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

154.    Pursuant to 42 U.S.C. 1988, Ms. Watson is entitled to attorney fees incurred in bringing this action

**CLAIM II**

**(DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE CONSTITUTION OF THE STATE OF COLORADO)**

155.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

156.    This Count is brought against all Defendants.

157.    Article 2, § 16 of the Constitution of the State of Colorado provides that the accused shall enjoy the "right to appear and defend in person and by counsel; . . . to meet the witnesses against him face to face . . . and a speedy public trial *by an impartial jury* . . . ." (emphasis added).

158.    Article 2, § 18 grants the right against self-incrimination.

159.    Article 2, § 25 declares that "no person shall be deprived of life, liberty or property, without due process of law."

160.    The Due Process clauses of the Constitution of the State of Colorado are implicated by higher education disciplinary decisions, including the disciplinary decisions under CU Boulder Policy and OIEC Resolution Procedures.

161.    Defendants have a constitutional obligation to provide a fundamentally fair and reliable process.

162.    Ms. Watson is entitled, under the Constitution of the State of Colorado, to the opportunity to be heard in a meaningful manner by CU Boulder's Office of Institutional Equity and Compliance (OIEC), the Hearing Officer, the Sanctioning Board, and the Appeal Board, as required by CU Boulder Policy and OIEC Resolution Procedures.

163.    Defendants violated Ms. Watson's rights under the Constitution of the State of Colorado in the same manner that Ms. Watson's rights were violated under the Constitution of the United States, as alleged in Count I.

164.    Ms. Watson is entitled to a declaration that CU Boulder Policy and OIEC Resolution Procedures, as applied to Ms. Watson, violate the Due Process clauses of the Constitution of the State of Colorado.

165.    As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

166.    Pursuant to C.R.S. § 14-10-119, Ms. Watson is entitled to attorney fees incurred in bringing this action.

### CLAIM III

### (42 U.S.C. § 1983 – VIOLATON OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION)

167.    Plaintiff repeats and incorporates all allegations of this Complaint, as if fully set forth herein.

168.    This Count is brought against all Defendants.

169.    Defendants acted under color of law in violating Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

170.    A person has a protected liberty interest in her good name, reputation, honor, and integrity, of which she cannot be deprived without due process. A student enrolled at CU Boulder also has a protected liberty interest in her public education.

171.    Defendants have a constitutional obligation to provide a fundamentally fair and reliable process.

172.    By depriving Plaintiff of her good reputation, taking away her right to a public education, and showing reckless or callous indifference to Plaintiff's federal protected rights, Defendants intentionally, willfully, wantonly, oppressively, and maliciously violated Plaintiff's due process rights.

173.    Defendants disregarded the clearly established due process rights of students in disciplinary proceedings when it deprived Plaintiff of the requisite due process and deprived Plaintiff her liberty interest in a public education.

174.    Defendants' actions against Plaintiff have caused and continue to cause substantial, immediate, and continuing damage to her, including prejudicing her acceptance to higher education academic institutions, diminishing her reputation, and causing undeniable anxiety and depression.

175.    Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

176.    Defendants violated the rights and guarantees set forth in the Fifth and Fourteenth Amendments of the United States Constitution during the investigation, adjudication, and appeal of the Complaint against Plaintiff.

177.    As a result of CU Boulder's due process violations, which resulted in and unduly severe and unwarranted sanctions which continues to injure Plaintiff's reputation and right to continue her education, an injunction should issue directing CU Boulder to (a) reverse the outcome of the findings; (b) expunge Plaintiff's disciplinary record; (c) remove any record of Plaintiff's expulsion from her education file; and (d) permanently destroy any record of these allegations.

178.    Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to have any record of the investigation and subsequent sanctions expunged from her academic record, removing any reference to the expulsion from her academic file and destroying all records pertaining to the investigation, and to have her identity remain confidential.

179.    Pursuant to 42 U.S.C. § 1988, Ms. Watson is entitled to attorney fees incurred in bringing this action.

## CLAIM IV
### (BREACH OF CONTRACT)

180.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

181.    This Count is brought against all Defendants.

182.    Based on the aforementioned facts and circumstances, CU Boulder created express and implied contracts when Plaintiff accepted an offer of admission to CU Boulder and paid tuition and fees.

183.    In consideration of this payment, CU Boulder published policies and procedures.

184.    Based on the foregoing facts and circumstances, CU Boulder breached express and implied agreements with Plaintiff.

185.    A non-exhaustive list of CU Boulder's breaches throughout its investigation of the Plaintiff include the following:

a.   Failure to provide a fair and equitable process to investigate and address the allegations against Plaintiff that provides fundamental due process, as required by CU Boulder Policy and OIEC Resolution Procedures;

b.   Failure to utilize a fair and unbiased process that treats all individuals with respect and dignity, as required by CU Boulder Policy and OIEC Resolution Procedures;

c.   Failure to provide a prompt, fair, impartial, and equitable resolution, as required by CU Boulder Policy and OIEC Resolution Procedures;

d.   Failure to create an investigation report that fairly summarized the relevant evidence, as required by CU Boulder Policy and OIEC Resolution Procedures;

e.   Failure to obtain the entire Boulder Police Department file, including Body Worn Camera recordings;

f.   Failure to conduct and fair and respectful hearing, as required by CU Boulder Policy and OIEC Resolution Procedures;

g.  Failure to comply with policies established by the Board of Regents by not conducting the investigation ethically and in compliance with CU Boulder Policy and OIEC Resolution Procedures, due process, Title IX, and Title VI;

h.  Discrimination on the basis of race by the Sanctioning Board in applying the harsh sanction of expulsion and the Appeal Board in upholding the sanction of expulsion; and

i.  Failure by the Appeal Board to fully consider Plaintiff's appeal and provide a rational result.

186.    Defendants were aware of these actions in this case and did nothing to ensure a fair disciplinary process.

187.    As a direct, reasonable, and foreseeable consequence of this breach, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete her studies and degree at CU Boulder, detrimental impacts on her future career and higher education prospects, and other direct and consequential damages.

188.    As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

189.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

## CLAIM V
## (VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972)

190.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

191.    This Count is brought against CU Boulder.

192.    On June 23, 1972, the president of the United States signed into law Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*  Title IX is a comprehensive federal law that protects people from discrimination based on sex in education programs or activities that receive federal financial assistance.

193.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." Where sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available.

194.    Title IX applies to schools, local and state educational agencies, and other institutions that receive federal financial assistance from the U.S. Department of Education. (DOE), including CU Boulder.

195.    Both the DOE and the Department of Justice (DOJ) have promulgated regulations under Title IX that require schools to "adopt and publish grievance procedures" that provide for the "prompt and equitable resolution" of student complaints alleging any action which would be prohibited by Title IX regulations. *See* 34 C.F.R. § 106.8(c) (DOE); 28 C.F.R. § 54.135(b) (DOJ).  Such prohibited actions include all forms of sexual harassment, including certain types of unwelcome sexual conduct, sexual assault, dating violence, domestic violence, and stalking. *See* 34 C.F.R. § 106.30(a).

196.    As applicable here, the DOE's 2020 Amendments to the Title IX regulations took effect on August 14, 2020, and apply to any sexual harassment allegations occurring after that date, but before August 1, 2024.[11] *Nondiscrimination on the Basis of Sex in Education*

---

[11] On April 19, 2024, the DOE released new amendments to the Title IX regulations that will take effect August 1, 2024.  The amended regulations significantly broaden the protections of Title IX by redefining sexual harassment, expanding protections for LGBTQI+ and pregnant students, and significantly modifying the grievance procedure for complaints. *See Nondiscrimination on the Basis of Sex in Education Programs or*

*Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The 2020 amendments to the Title IX regulations added specific, legally binding steps that schools must take in response to notice of alleged sexual harassment. The 2020 amendments to the Title IX regulations also introduced several due process protections for respondents accused of sexual harassment and limited the application of Title IX for off-campus (*i.e.*, non-school related) incidents and parties no longer affiliated with the school.

197.    The U.S. Department of Education's Office of Civil Rights (OCR) enforces Title IX to ensure that institutions that receive federal financial assistance from the Department of Education comply with the law. In addition to its enforcement activities, OCR provides information and guidance to schools, universities, and other educational institutions and agencies to assist them in voluntarily complying with the law.

198.    The Title IX regulations, as amended in 2020, require universities, such as CU Boulder, to comply with the grievance process set forth in 34 C.F.R. § 106.45.

199.    A university's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment, such as dating violence, "may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a).

200.    Title IX is not, however, the exclusive remedy for sexual misconduct. Instead, a university has discretion to respond to reports of sexual misconduct that do not fit within the scope of conduct covered by the Title IX grievance process. 85 Fed. Reg. at 30,199.

201.    Any provision, rules, or practices other than those required by § 106.45 that a university adopts as part of its grievance process for handling formal complaints of sexual harassment, such as dating violence, "must apply equally to both parties." 34 C.F.R. § 106.45(b).

---

*Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (April 29, 2024) (to be codified at 34 C.F.R. pt. 106).

202.    Students attending public universities, such as CU Boulder, who have been accused of sexual misconduct, have a right to due process under Title IX.

203.    A university's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment, such as dating violence, "may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a).

204.    Title IX may be violated by a school's imposition of university discipline where gender is the motivating factor in the decision to discipline.

205.    Challenges to university disciplinary proceedings for sex discrimination can fall into the following two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

206.    The Tenth Circuit has framed the question for summary judgment as, "Could a reasonable jury – presented with the facts alleged – find that sex was a motivating factor in the university's disciplinary decision?" *Doe v. DU* 1 F. 4th 822, 830 (10th Cir. 2021).

207.    CU Boulder engaged in "selective enforcement." Regardless of Plaintiff's guilt or innocence, the severity of the penalty of expulsion and/or the decision to initiate the proceeding against Plaintiff in the first place was affected by Ms. Watson's gender.

208.    An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was innocent and wrongly found to have committed an offense because the incident at issue was an accident. Gender bias was a motivating factor behind the erroneous findings.

209.    Plaintiff was not provided with adequate due process protections, including but not limited to a fair and impartial process, a thorough and complete investigation, proper evaluation of witness credibility, motivation, and intent, proper placement of the

burden of production on the university, and the presumption of innocence, as shown by the actions of CU Boulder's investigator, hearing officer, sanctioning committee, and appeal board.

210.     Upon information and belief, male students at CU Boulder found responsible for violent assaults that result in life altering injuries have suffered only minor sanctions despite the severity of their policy violations. Indeed, in 2022, a CU Boulder football team member, a white male, was not expelled from the university despite punching a good Samaritan about 30 times, causing a fractured skull, internal brain bleeding, and permanent damage.[12]

211.     Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX that found her responsible for sexual misconduct and punished severely for it.

212.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

213.     As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

---

[12] *See*, *e.g.*, *Former CU Buff lineman Carson Lee sentenced to 30 days in jail for assault*, Daily Camera, https://www.dailycamera.com/2022/05/19/former-cu-buff-lineman-carson-lee-sentenced-to-30-days-in-jail-for-assault/# (noting that, following a violent assault that resulted in the victim suffering a fractured skull and internal brain bleeding after being punched around 30 times, Lee, the white, male student responsible, was merely suspended from CU Boulder and allowed to transfer to a new school without any permanent damage to his education, reputation, or future).

214.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

## CLAIM VI
## (VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964)

215.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

216.    This Count is brought against CU Boulder.

217.    In 1964, President Lyndon B. Johnson signed the landmark Civil Rights Act of 1964. Included among the Civil Rights Act's eleven titles is Title VI, codified at 42 U.S.C. §§ 2000d *et seq*. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs that receive federal financial assistance.

218.    Title VI of the Civil Rights Act of 1964 states that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

219.    Title VI of the Civil Rights Act of 1964 prohibits recipients of federal funding, including CU Boulder, from discriminating on the basis of race, color, or national origin. *Id*.; *see also* 34 C.F.R. Part 100 (implementing regulations).

220.    The Department of Education's Office of Civil Rights (OCR) is entrusted with enforcing Title VI in federally funded schools.

221.    The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001)).

222.    The U.S. Supreme Court has described the objectives of Title VI as twofold: (1) to "avoid the use of federal resources to support discriminatory practices"; and (2) "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

223.    Section 601 of Title VI bars discrimination based on race, color, or national origin in federally funded programs. 42 U.S.C. § 2000d. Individuals subjected to discrimination in such a program can sue a recipient to enforce Section 601. In such cases, the Supreme Court has read the statute to bar only intentional discrimination that violates the Constitution's Equal Protection Clause. *Alexander v. Sandoval*, 532 U.S. at 280-81.

224.    Title VI applies to all operations of a school or university that takes federal funding, including disciplinary actions. A school or university's disciplinary practices can unlawfully discriminate when the school intentionally subjects students to different treatment based on race. A school or university that disciplines students of one race more harshly than similarly situated students of another race might violate Title VI.

225.    Title VI applies to all operations of a school or university that takes federal funding, including disciplinary actions. A school or university's disciplinary practices can unlawfully discriminate when the school intentionally subjects students to different treatment based on race. A school or university that disciplines students of one race more harshly than similarly situated students of another race might violate Title VI.

226.    Title VI prohibits schools, such as CU Boulder, from intentionally disciplining students differently based on race. Intentional discrimination occurs when, as here, a school has a discipline policy that is neutral on its face, but the school administers the policy in a discriminatory manner.

227.    Upon information and belief, white students at CU Boulder found responsible for violent assaults that result in life altering injuries have suffered only minor sanctions despite the severity of their policy violations. Indeed, in 2022, a CU Boulder football team

member, a white male, was not expelled from the university despite punching a good Samaritan about 30 times, causing a fractured skull, internal brain bleeding, and permanent damage.[13]

228.    Selective enforcement of a facially neutral policy against students of one race is also prohibited intentional discrimination. This can occur, for example, when a school official elects to overlook a violation of a policy committed by a student of one racial group, while strictly enforcing the policy against a student who is a member of another racial group.

229.    According to OIEC Resolution Procedures, possible sanctions available upon a finding of responsibility include, but are not limited to, warning/written reprimand, educational sanctions, formal disciplinary probation, restriction or denial of university services, delayed conferral of diploma or degree, suspension, exclusion, and expulsion. Ex. 2, § VII(D)(1)(e)(i).

230.    Expulsions are rare in cases concerning intimate partner violence that are subject to OIEC Process and Procedures. *See* Ex. 18; Ex. 19. Expulsion requires a student to permanently leave the university and includes an automatic exclusion from University of Colorado property. An expulsion decision results in the student being expelled from all campuses in the University of Colorado system. Importantly, a notation of "Expelled Responsible Sexual Misconduct" remains ***permanently*** on a student's transcript. Ex. 2, § VII(D)(1)(e)(i).

231.    CU Boulder's *Student Respondent Statistical Report* shows that similarly situated cases concerning allegations of dating or domestic violence are primarily addressed through remedies-based or other resolutions and are rarely addressed through a formal grievance process. *See*, *supra*, ¶¶ 95, 96.

---

[13] *See*, *supra,* n. 12.

232.    CU Boulder's *Student Respondent Statistical Report* shows that the harsh and unnecessary sanction of expulsion is cases concerning allegations of dating or domestic violence are extremely rare or nonexistent. *See*, *supra*, ¶¶ 95, 96.

233.    CU Boulder's disciplinary practices in this case unlawfully discriminated against Plaintiff based on her race when the University intentionally subjected Plaintiff to different treatment based on her race by bringing a formal complaint against Plaintiff in a case that should have been resolved through an informal process or a remedies-based or other resolution.

234.    CU Boulder's disciplinary practices in this case unlawfully discriminated against Plaintiff based on her race when the University intentionally subjected Plaintiff to different treatment based on her race by punishing Plaintiff with the harsh and unnecessary sanction of expulsion.

235.    Upon information and belief, similarly situated white students at CU Boulder do not receive the harsh and unnecessary sanction of expulsion for minor accidents that cause no lasting harm.[14]

236.    CU Boulder's unlawful discrimination in Plaintiff's discipline, specifically the harsh and unnecessary sanction of expulsion for an incident that was clearly an accident, foreclosed opportunities for Plaintiff, pushing her out of the classroom and diverting her from a path to success in school and beyond.

237.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title VI that found her responsible for sexual misconduct and punished severely for it.

---

[14] While some statistical information concerning CU Boulder's sanctioning practices is publicly available, *see*, *e.g.*, *supra* ¶¶ 95. 96, information regarding race and sanctioning at the university is exclusively within CU Boulder's possession, custody, and control and is not publicly reported. Accordingly, Plaintiff needs to obtain discovery in order to further assess this claim.

238.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

239.    As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

240.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

## CLAIM VII
### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

241.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

242.    This Count is brought against all Defendants.

243.    Based upon the aforementioned facts and circumstances, CU Boulder breached and violated the covenant of good faith and fair dealing expressed and implied in its contract with Plaintiff by making an unsupported finding of responsibility and by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against her.

244.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete her studies at CU Boulder, detrimental impact on her future career and higher education prospects, and other direct and consequential damages.

245.     As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

246.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

**CLAIM VIII**

**(ESTOPPEL AND RELIANCE)**

247.     Plaintiff repeats and incorporates all of the allegations of this Complaint as if set forth herein.

248.     This Count is brought against all Defendants.

249.     CU Boulder's various policies constitute representations and promises by CU Boulder that the university should reasonably expect to induce action or forbearance by Plaintiff.

250.     CU Boulder expected, or should have reasonably expected, Plaintiff to accept its offer of admission, to incur tuition and fee expenses, and choose to not attend other universities based on its express and implied promises that CU Boulder would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff her procedural rights should she be accused of a violation of CU Boulder's policies.

251.     To her detriment, Plaintiff relied on these express and implied promises and representations made by CU Boulder.

252.     Based on the foregoing, CU Boulder is liable to Plaintiff based upon the principle of estoppel.

253.     As a direct, reasonable, and foreseeable consequences of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic

and reputational harm, an inability to complete her studies at CU Boulder, detrimental impact on her future career and higher education prospects, and other direct and consequential damages.

254.   As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

255.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff demands the following:

   a. On Claim I, judgment declaring that CU Boulder Policy and OIEC Resolution Procedures, as applied to this case, violate the Due Process clauses of the United States Constitution, reversal of the outcome and findings related to the sexual misconduct charges against Plaintiff, reversal of the Sanction against Plaintiff, expungement of Plaintiff's disciplinary record, removal of any record of Plaintiff's expulsion from her education file, destruction of any and all records pertaining to the investigation, and enjoin CU Boulder from disclosing to any third parties any information related to the disciplinary charge, investigation, findings, and/or sanction.

   b. On Claim II, judgment declaring that the CU Boulder Policy and OIEC Resolution Procedures, as applied to this case, violate the Due Process clauses of the Constitution of the State of Colorado, reversal of the outcome and findings related to the sexual misconduct charges against

Plaintiff, reversal of the Sanction against Plaintiff, expungement of Plaintiff's disciplinary record, removal of any record of Plaintiff's expulsion from her education file, destruction of any and all records pertaining to the investigation, and enjoin CU Boulder from disclosing to any third parties any information related to the disciplinary charge, investigation, findings, and/or sanction.

c. On Claim III, reversal of the outcome and findings related to the sexual misconduct charges against Plaintiff, reversal of the Sanction against Plaintiff, expungement of Plaintiff's disciplinary record, removal of any record of Plaintiff's expulsion from her education file, destruction of any and all records pertaining to the investigation, and enjoin CU Boulder from disclosing to any third parties any information related to the disciplinary charge, investigation, findings, and/or sanction.

d. On Claims IV-VIII, judgment in favor of Plaintiff awarding damages in an amount to be determined at trial, reversal of the outcome and findings related to the sexual misconduct charges against Plaintiff, reversal of the Sanction against Plaintiff, expungement of Plaintiff's disciplinary record, removal of any record of Plaintiff's expulsion from her education file, destruction of any and all records pertaining to the investigation, and enjoin CU Boulder from disclosing to any third parties any information related to the disciplinary charge, investigation, findings, and/or sanction.

e. Court costs, interest, and other reasonable expenses incurred in maintaining this action, including reasonable attorney fees as authorized by 42 U.S.C. § 1988, C.R.S. § 14-10-119, and any other statute permitting recovery of attorney fees and costs.

f.   Other and further relief as the Court deems under the facts,

circumstances, and evidence herein.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.


Respectfully submitted the 17th day of April 2025 by


s/ *Jason Savela*
Jason Savela, Esq.
The Savela Law Firm, P.C.
3825 Iris Ave., Suite 100
Boulder, CO 80301
720-260-7392
jason@savelaw.net

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of April 2025, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to

all parties of record.

s/ Jason Savela