EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO.: 24-cv-2576-GPG-TPO

LOULILLIAN WATSON,

Plaintiff,

v.

UNIVERSITY OF COLORADO BOULDER; THE BOARD OF REGENTS FOR UNIVERSITY OF COLORADO;
JUSTIN SCHWARTZ, in his official capacity;
KATE BAUER, in her official capacity;
LLEN POMEROY, individually and in her official capacity;
ANN GUSHURST, individually and in her official capacity; and
REGINA TIRELLA, individually and in her official capacity,

Defendants.

---

## THIRD AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, Loulillian Watson, by and through her counsel, the Savela Law Firm, P.C., as and for her Third Amended Complaint against Defendants University of Colorado, Boulder, the Board of Regents for the University of Colorado, Justin Schwartz, Kate Bauer, Llen Pomeroy, Ann Gushurst, and Regina Tirella, respectfully alleges as follows:

## THE NATURE OF THE ACTION

1. This case arises out of the actions taken and procedures employed by the Defendants, the University of Colorado, Boulder through its Board, the Board of Regents for the University of Colorado ("CU Boulder" or "University"), CU Boulder's Office of Institutional Equity and Compliance (OIEC), as well as the investigator, hearing officer, and sanctioning board assigned by the University to this case.

EXHIBIT A

2. The incident at issue here was an accident, pure and simple. John Doe, the "Complainant" [2] in this case, told police, the CU Boulder football coaching staff, and everyone around him that what happened was an accident or a mistake. This is a story of a young, black woman, Loulillian Watson ("Plaintiff"), fighting against the strength and influence of the CU Boulder football organization. Loulillian Watson had no chance.

3. Loulillian Watson should not have been expelled from CU Boulder. Loulillian Watson should not have a permanent notation on her education clearinghouse transcript that says she violated CU Boulder's Sexual Misconduct Policy. Loulillian Watson should not have her entire life dictated by a single event that both parties agree was an accident and a mistake. CU Boulder should not have the power to erase the future of an innocent young black woman who wants nothing other than to give back to her community in Mississippi simply because of an accident.

4. Neither Ms. Watson nor Doe participated in the investigation. Neither Ms. Watson nor Doe responded to the investigation report. Neither Ms. Watson nor Doe testified during the hearing. Indeed, both Ms. Watson and Doe agreed that this incident was an accident. But Ms. Watson and Doe were ignored. Instead, the reputation of the CU Boulder football program took precedence and a young woman's life was effectively destroyed.

5. The University permitted the OIEC to weaponize CU Boulder's sexual misconduct policy against Ms. Watson when Llen Pomeroy (Title IX Coordinator), Kate Bauer (investigator), Ann Gushurst (hearing officer), and Regina Tirella (Chair of sanctioning board) (collectively, the "Individual Defendants") not only failed to ensure that the investigatory and adjudicatory processes were fair and objective, but also contributed

---

[2] The formal Complaint in this case was signed and submitted by Defendant Llen Pomeroy on behalf of CU Boulder. Ex. 5. John Doe, a pseudonym for the "Complainant" in this case, expressly told CU Boulder football staff and coaches, the police, and everyone around him that he did not want to report the incident. *See*, *e.g.*, Ex. 21 (noting that Doe told football coaches and staff multiple times that he did not want to report the incident).

EXHIBIT A

to the defective, prejudicial, and arbitrarily inequitable process that was replete with bias against Ms. Watson.

6. The investigation in this case was flawed. The hearing was a sham. The appeal was full of inconsistencies and virtually ignored. And the ultimate decision to expel Loulillian Watson was unfair and biased. The Court must undo this injustice.

**THE PARTIES**

7. Plaintiff, Loulillian Watson ("Plaintiff"), is a citizen of the United States and a resident of the State of Colorado. Until her expulsion, Ms. Watson was enrolled as a full-time student at CU Boulder.

8. Defendant, the University of Colorado at Boulder (CU Boulder), is the flagship public university for the State of Colorado and part of the University of Colorado system with its principal administrative offices in Denver, Colorado. CU Boulder is authorized, supervised, and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes.

9. Defendant, the Board of Regents for the University of Colorado at Boulder, is the governing body of CU Boulder. It is composed of nine members and charged with the general supervision of the university and the exclusive control and direction of all funds and appropriations to the university, unless otherwise provided by law.

10. Defendant, Dr. Justin Schwartz, ("Defendant Schwartz") is a natural person and, upon information and belief, a resident of the State of Colorado. Defendant Schwartz is the 12th chancellor of CU Boulder, joining the campus July 1, 2024. Defendant Schwartz acts as the chief executive and academic officer of the campus. Defendant Schwartz reports to the President of the University System and the Board of Regents. Defendant Schwartz is the

direct supervisor of the CU Boulder OIEC. Defendant Schwartz is in the position to give Ms. Watson the relief she seeks.[4]

11. Defendant, Llen Pomeroy ("Defendant Pomeroy") is a natural person and, upon information and belief a resident of the State of Colorado. At all times relevant herein, Defendant Pomeroy was the Associate Vice Chancellor for the OIEC and Title IX Coordinator. Defendant Pomeroy signed and submitted the formal Complaint against Loulillian Watson.

12. Defendant, Kate Bauer ("Defendant Bauer") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Bauer was the Senior Investigator for the Office of Institutional Equity and Compliance (OIEC) at CU Boulder and the Senior Investigator investigating the allegations against Loulillian Watson.

13. Defendant, Ann Gushurst ("Defendant Gushurst") is a natural person and, upon information and belief, a resident of the State of Colorado. At all times relevant herein, Defendant Gushurst was the Hearing Officer assigned to preside over Loulillian Watson's case.

14. Defendant, Regina Tirella ("Defendant Tirella") is a natural person and, upon information and belief a resident of the State of Colorado. At all times relevant herein, Defendant Tirella was the Senior Director of Support and Safety Measures and Deputy Title IX Coordinator. Defendant Tirella was the Chair of Sanctioning Board in Loulillian Watson's case.

//

//

---

[4] Former Chancellor for CU Boulder, Philip P. Distefano, was the Chancellor at the time Ms. Watson was investigated and expelled from CU Boulder. Opposing counsel informed Plaintiff's counsel that Defendant Schwartz is the proper Defendant in this case because he is in the position to give Ms. Watson the relief she seeks. Plaintiff reserves the right to substitute Mr. Distefano for Defendant Schwartz, if necessary.

EXHIBIT A

## JURISDICTION AND VENUE

15. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367.

16. Doe filed a Notice of Injury by a Public Entity and an employee thereof pursuant to C.R.S. § 24-10-109. Ex. 3.

17. This Court has personal jurisdiction over the University and Board on the ground that the University of Colorado systems is conducting business in the State of Colorado.

18. This Court has personal jurisdiction over the Individual Defendants as they all reside in the State of Colorado and/or their wrongful and unlawful actions, individually and collectively, took place in the State of Colorado.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as the Defendants are residents of the state in which the district is located, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

20. Incorporating the State of Colorado's statute of limitations (*see* C.R.S. § 13-80-102), the two-year statute of limitations for this matter has not expired. [5]

## FACTUAL ALLEGATIONS

### I. Background

21. Plaintiff, Loulillian Watson, was born and raised in the state of Mississippi. Ms. Watson grew up in Quitman County, a small, tight knit community located in the Mississippi Delta. As a black woman raised in a single parent family, Ms. Watson's connection with her family and community continues to drive her commitment to succeed

[5] Plaintiff's claims accrued on or around October 19, 2022, the date Plaintiff received the final, non-appealable decision. *See* Ex. 15 (stating that the "matter is now considered closed as of today, October 19, 2022"). Plaintiff filed her initial Complaint on September 19, 2024 (ECF 2), within the two-year limitation.

EXHIBIT A

academically. Ms. Watson's future goals include doing everything in her power to help her family and give back to her community.

22. Loulillian Watson and John Doe met at Coahoma Community College in Clarksdale, Mississippi, prior to attending CU Boulder. The couple started dating in mid-2021.

23. At CU Boulder, Ms. Watson was working toward a B.A. Degree in Speech, Language, and Hearing Sciences. She intended to graduate from CU Boulder and hoped to give back to the community that raised her. At the time, Ms. Watson was 5'1" and 118 pounds.

24. Doe studied Sociology at CU Boulder. At the time, Doe was a 6'4", 232-pound outside Linebacker for the CU Boulder football team.

25. Both Doe and Ms. Watson are committed to giving back to their community and have high hopes for their futures.

## II. The Alleged Incident

26. On February 2, 2022, Loulillian Watson and John Doe were at Doe's off campus apartment in Boulder. Doe requested Ms. Watson leave his apartment. Ms. Watson agreed and started to collect her belongings, including her wallet, purse, and other personal items.

27. Doe believed some of the items Ms. Watson wanted to take were gifts from her to him. To persuade Ms. Watson to leave the disputed items, Doe took Ms. Watson's purse without permission, a purse Ms. Watson purchased herself that was her prized possession. Ms. Watson objected. Doe held the purse out of Ms. Watson's reach and refused to return it. Doe picked up a pair of scissors and threatened to destroy Ms. Watson's purse.

28. Feeling threatened by the scissors, Ms. Watson picked up a small paring knife. Doe still refused to return Ms. Watson's purse. Ms. Watson attempted to grab the purse from Doe's hands, reaching upward, at times jumping, with one hand, and holding the

EXHIBIT A

paring knife still in her other hand, close to her side. Doe was accidentally cut by the small knife. *See* Ex. 16 (letter from Ms. Watson to the public defender describing the incident).

29. The injury to Doe was not immediately discovered. Once it was discovered, Ms. Watson attempted first aid and suggested that Doe go to the hospital. Both Doe and Ms. Watson were concerned about what would happen if the police became involved. As young, black students from the South, the pair were apprehensive to report the incident. Both were very wary of police involvement, and both had their futures to consider. They feared being misunderstood by police or worse. However, as soon as they realized that the wound may need medical attention, they drove together to the hospital. Neither knew what to do, but both understood that Doe needed medical treatment.

30. Ms. Watson went with Doe to the hospital, walked him into the lobby, and helped him check in. Doe was taken away and did not have contact with Ms. Watson. Ms. Watson left the hospital after she learned Doe would be there for hours or even overnight.

31. Doe had a small wound that required exploratory surgery.

32. While Doe was at the hospital, he contacted his football coaches to say he would not be able to attend a mandatory team meeting. Doe was a starting athlete on the CU Boulder football team. *See* Ex. 8 at 19-20 (noting that BCH told the OIEC investigator that Doe contacted the training staff when he arrived at the hospital, but the contents of that conversation were redacted by the Boulder Police Department); *see also* Exs. 20-26 (OIEC interviews with CU Boulder football coaches and staff).

33. In his initial conversations with CU Boulder football coaches and staff, Doe tried to cover up the truth about what happened by falsely telling his coaches that he has suffered an allergic reaction and/or had food poisoning. *See* Ex. 24 (OIEC interview of Witness 5); Ex. 23 (OIEC interview with Witness 4); Ex. 25 (OIEC interview with Witness 6). Doe did not know that he had signed a release allowing CU football coaches to view his medical records. CU football staff soon learned the truth about Doe's medical condition –

EXHIBIT A

Doe had a knife wound with a possible cut to an internal organ and required exploratory, laparoscopic surgery. The surgery was ultimately successful.

34. Boulder Police came to the hospital to speak with Doe on February 3, 2022. Doe refused to provide any statement to Boulder Police. Ex. 8 at 6; *see also* Ex. 17 at 11. Boulder Police spoke with the doctor who treated Doe. The doctor explained that Doe had suffered a 1.2-centimeter-wide laceration just below his rib cage. Ex. 17 at 11.

35. Doe was released from the hospital on February 3, 2022. Doe contacted Ms. Watson and asked her to pick him up from the hospital.

36. Shortly after Doe was released from the hospital, Doe met with CU football coaches and staff. Doe was unwilling to discuss the incident when asked for additional details and informed them that he did not want to report the incident to anyone, including the police and the OIEC.

37. Upon information and belief, CU football coaches and staff scared Doe into making a report by saying that the other party, Loulillian Watson, could make a claim against Doe weeks or months later and her report might ruin his football career at CU Boulder and professionally. CU football staff advised Doe to make a report against Ms. Watson to protect himself. *See*, *e.g.*, Ex. 21 (Witness 2, the Head Coach of the CU Boulder football team, stated he advised Doe "to report in case the situation 'circled back' in a month or two and [Doe] found himself as the accused party."); *see also* Ex. 8 at 25-27. CU football coaches and staff indicated that they had a good relationship with certain officers in the Boulder Police Department and they could help him. Ex. 21 at 3 (stating that Lance Carl contacted Deputy Weinheimer directly to start the police reporting process); Ex. 17 at 27 (stating that Doe was only willing to speak to Deputy Weinheimer).

38. Doe spoke with Boulder Police over the phone. Ex. 8 at 6-9; Ex. 17 at 68-70. Lance Carl was present during Doe's conversation with police. Ex. 8 at 7; Ex. 17 at 68. The

conversation was recorded. Ex. 17 at 68. A voice other than Doe can be heard whispering to Doe.

39. The narrative Doe provided to the Boulder Police Department mirrored the narrative Lance Carl provided to the OIEC. *Compare* Ex. 17 at 11 *with* Ex. 20 at 2.

40. Lance Carl initially contacted the OIEC to report the incident on February 3, 2022. *See* Ex. 31 at 4; *see also* Ex. 8 at 4, 20, n. 10.

41. The version of events that both Lance Carl and Doe provided on November 3, 2022, were substantially similar to the facts the Hearing Officer relied upon in the Written Determination. Notably, however, this version of events contained multiple discrepancies from the narratives of other witnesses, including subsequent narratives provided by Doe. *See* Exs. 27, 28, 29 (State Public Defender interviews of Doe); *see also* Ex. 30; Exs. 21-26 (OIEC witness interview); Ex. 30 (State Public Defender interview of Ms. Watson's friend).

42. Upon information and belief, Doe was encouraged by CU football staff to say Ms. Watson committed a crime when she attacked him with a knife and told to exclude true information about Doe's provoking actions, his violence against Ms. Watson, and the accidental nature of the actual events. This encouragement by CU football staff was designed to protect Doe from any consequences, specifically domestic violence charges that could end his football career at CU Boulder and professionally.

43. Upon information and belief, CU Boulder football staff were aware their jobs were in serious jeopardy, based on the team's record, and were aware that losing their starting defensive end would harm their ability to succeed in the coming season. CU Boulder football staff knew that, without success, CU Boulder would fire their head coach, and many others would likely lose their jobs as well.

44. Later that day, Boulder Police searched Doe's apartment with Doe's consent. Doe was present. The knife was not found. A pair of scissors was observed but not logged into evidence. Ex. 8 at 11-12; Ex. 17 at 12, 29-30.

45. Later that evening, Boulder Police Department contacted Ms. Watson at her residence. Ms. Watson was scared. Ms. Watson had no police record before this incident. Ms. Watson told Boulder Police multiple times that the incident was an accident. Ms. Watson explained that Doe had her bag and was threatening to cut it up with scissors – in one hand, Doe held the bag, and in the other, a pair of scissors. Ex. 8 at 17; Ex. 17 at 33. Ms. Watson explained that Doe accidentally leaned into the knife when she tried to grab her bag from him. Ms. Watson told police that she attempted first aid and went to the hospital with Doe when they realized that the wound was serious. Ex. 8 at 17; Ex. 17 at 34.

46. Growing up in rural Mississippi, Ms. Watson did not believe she could trust police. She wanted to protect Doe. She misunderstood the OIEC resolution process and possible criminal liability. She loved Doe and still does. Ms. Watson feared Doe would lose his football career both at CU and professionally if she spoke the truth. Ms. Watson tried not the speak with police officers, but in her effort to protect Doe, Ms. Watson ultimately made statements that shed a negative light on her.

47. On February 8, 2022, Boulder Police arrested Ms. Watson at her on campus apartment. Ms. Watson was led out of her apartment in handcuffs in front of her peers. Ms. Watson was charged with First Degree Assault, Felony Menacing, and Obstruction of Telephone Service, all with a Domestic Violence Enhancer. *See* Ex. 17 at 51.

48. This case required a thorough, independent, fair, complete, and unbiased resolution process to uncover the full truth. CU Boulder and the Individual Defendants failed to conduct a thorough, independent, fair, complete, and unbiased resolution process. As a result, CU Boulder and the Individual Defendants failed Ms. Watson.

## III. CU Boulder's Sexual Misconduct Policy and OIEC Resolution Procedures

49. In recent years, there has been substantial criticism of CU Boulder's handling of sexual misconduct investigations. Indeed, referencing CU Boulder's effectiveness in investigating complaints submitted to the OIEC, a CU Boulder Law professor called the OIEC

a "joke" and stated that the OIEC "is basically a Potemkin process or setup for the purpose of running cover for the university's central administration."[6]

50. CU Boulder's OIEC handles sexual misconduct complaints for CU Boulder under the Sexual Misconduct, Intimate Partner Violence, and Stalking Policy and the OIEC Resolution Procedures 2021-2022. Ex. 1. ("CU Boulder Policy" or "Sexual Misconduct Policy"); Ex. 2 ("OIEC Resolution Procedures"). CU Boulder Policy requires the university to address allegations of sexual misconduct "in a manner that ensures all parties receive prompt, fair, and equitable treatment and that safeguards the dignity and rights of all involved." Ex. 1, § I. The Policy mandates that CU Boulder provide "fair and equitable processes to investigate and address complaints" of sexual misconduct "that provide fundamental due process." *Id*. § II.

51. CU Boulder Policy prohibits sexual misconduct, including dating violence, whether the conduct is specifically prohibited by Title IX or conduct that falls outside of Title IX's jurisdiction. Ex. 1, § III. The OIEC Resolution Procedures are intended to be the formal resolution procedures for CU Boulder Policies, including the Sexual Misconduct Policy, and govern how the OIEC will administer and enforce the Policy. Ex. 2, § II(B)(1).

52. As applicable here, CU Boulder Policy defines dating violence as "violence committed by a person, on the basis of sex – 1. who is or has been in a social relationship of a romantic or intimate nature with the victim; and 2. where the existence of such a relationship shall be determined based on a consideration of the following factors: a. The length of the relationship; b. The type of relationship; and c. The frequency of interaction between the persons involved in the relationship." Ex. 1, § IX(C).

---

[6] *See*, *e.g*., Olivia Doak, *CU Boulder elects not to investigate hundreds of discrimination, harassment complaints*, Daily Camera, Aug. 27, 2024, https://www.dailycamera.com/2024/08/26/cu-boulder-elects-not-to-investigate-hundreds-of-discrimination-harassment-complaints/?clearUserState=true. The article went on to say that many professors at CU Boulder "don't have trust" in the administration. In fact, "[m]ore than half a dozen professors declined to speak to the Daily Camera on the record or anonymously about their experience with the OIEC, most citing fear of retaliation or other professional consequences."

EXHIBIT A

53. CU Boulder Policy applies to all students and applies to "conduct that occurs in an *education program or activity* of the university, or if the *complainant* or *respondent* are affiliated with the university community. This includes off-campus conduct, including online and electronic conduct." Ex. 1, § IV(A)(2). Alleged conduct may be considered either Title IX Sexual Misconduct or Sexual Misconduct, depending on an arbitrary determination of jurisdictional requirements.

54. According to CU Boulder Policy, Title IX Sexual Misconduct applies to conduct "that occurs in an *education program or activity* against a person in the United States," and in these cases, the Title IX Coordinator must utilize the Title IX Sexual Misconduct procedures prescribed by the Title IX Regulations. *Id*. § IV(A)(2)(a). In contrast, CU Boulder's Sexual Misconduct, "[a]pplies to conduct that does not otherwise meet the jurisdictional standard or definition of Title IX Sexual Misconduct, but . . . where both the *complainant* and *respondent* are affiliated with the university." *Id*. § IV(A)(2)(b)(ii).

55. If, as here, the Title IX coordinator determines that the alleged conduct does not meet the jurisdictional standard or definition of Title IX Sexual Misconduct, but both the complainant and respondent are affiliated with the university, CU Boulder Policy authorizes the Title IX Coordinator to arbitrarily determine whether the alleged conduct falls under Title IX Sexual Misconduct or whether the university has jurisdiction to take action pursuant to CU Boulder's Sexual Misconduct Policy. *Id.* § IV(A)(2).

56. Here, the Notice of Allegations states the following: "In this instance, both Complainant and Respondent are University of Colorado (CU Boulder) undergraduate students, and the allegations include sexual misconduct pursuant to the Policy. Therefore, the university has jurisdiction to investigate these allegations pursuant to Section IV(A)(2)(b)(i)." Ex. 6 at 1. The Notice of Allegations does not provide an explanation for why the Title IX Coordinator determined that the allegations did not fall under Title IX

jurisdiction. The facts here show extensive interplay with the most visible CU Boulder program, its football team, including the athletic directors' office, coaches, and staff.

57. To initiate the grievance process in cases of alleged sexual misconduct that do not fall under Title IX jurisdiction, either the complainant or Title IX Coordinator must file and sign a formal complaint. The complainant may or may not be a member of the university community. *Id*. § IV(A)(4)(b).

58. Whether bringing allegations of Title IX Sexual Misconduct or Sexual Misconduct, CU Boulder is required to follow the Resolution Process set forth in the OIEC Resolution Procedures. Ex. 2, § VII(D). According to the OIEC Mission Statement, the "OIEC utilizes fair and unbiased processes and treats all individuals . . . with respect and dignity." *Id*. § I. In the context of sexual misconduct, the OIEC Resolution Procedures express a commitment "to providing prompt, fair, impartial and equitable resolutions" of complaints. *Id.* § VII.

59. The OIEC resolution process must be conducted by "trained officials who do not have a conflict of interest or bias for or against the complainant or respondent, or against complainants or respondents generally." *Id*. § VII(D).

60. The formal grievance process includes five major stages: (1) filing and evaluation of the formal Complaint; (2) investigation; (3) dissemination of the investigative file and investigative reports; (4) hearing and determination regarding responsibility (including sanction, if application); and (5) appeal, as applicable. *Id*. § VII(D)(1).

61. The OIEC Resolution Procedures state that CU Boulder may dismiss a formal complaint at any time prior to the hearing "if the respondent is no longer enrolled or employed at the university" or "if specific circumstances prevent the university from gathering evidence sufficient to reach a determination" about the complaint or the allegations ("discretionary dismissal"). *Id*. § VII(D)(1)(b).

EXHIBIT A

62. If the Formal Grievance Process is commenced, the respondent and complainant receive a written Notice of Allegations. After the Notice of Allegations has been issued, "the OIEC's investigator(s) will seek to obtain all available evidence directly related to the allegations at issue." This may include conducting interviews with parties and witnesses, obtaining university records, and collecting other documentation, such as police reports, emails, text messages, etc. *Id*. § VII(D)(1)(c).]CU Boulder Policy and OIEC Resolution Procedures mandate an investigative process where the university, and not the parties, holds both the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility. Ex. 1 § VII(B); Ex. 2, § VII(D)(1)(c).

63. CU Boulder Policy and OIEC Resolution Procedure mandate an investigative process where the university provides the parties an equal opportunity to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence. Both parties must also be provided with an equal opportunity to inspect and review any evidence obtained as part of the investigation, including evidence that the university does not intend to rely upon in reaching a determination, so that each part can meaningfully respond to the evidence prior to the conclusion of the investigation. Ex. 1, § VII(B); Ex. 2 § VII(D)(1)(c).

64. As part of the grievance process, and with the relevant party's voluntary, written consent, the university may utilize records made or maintained by a physician, psychiatrist, or psychologist. Ex. 1, § VII(B); Ex. 2 § VII(D)(1)(c).

65. Prior to the completion of the investigative report, CU Boulder must send each party the evidence subject to inspection and review. Ex. 1, § VII(B)(7). The preliminary investigative report includes a written summary of relevant and material evidence, as determined by the OIEC investigator. The parties have at least 14 days to submit a written response. Ex. 2, § VII(D)(1)(d). The investigator must consider the evidence submitted in the written response prior to the completion of the investigation. Ex. 1, § VII(B)(7).

EXHIBIT A

66. CU Boulder must create an investigative report that "fairly summarizes the relevant evidence without reaching any findings of fact or conclusions" and provide the report to each party prior to the hearing. Ex. 1, § VII(B)(8). The final investigative report includes a written summary of relevant and material evidence, as determined by the OIEC investigator, and must incorporate the parties' responses to the preliminary investigative report. Ex. 2, § VII(D)(1)(d).

67. It should be noted that while the CU Boulder will appoint an advisor for a Respondent like Ms. Watson, they will not appoint the advisor prior to the scheduled hearing. Ex. 2, § VII(D)(1)(e). This means that Respondents like Ms. Watson do not have any help deciding whether to supply evidence or whether to make a statement to the OIEC. Respondents like Ms. Watson do not fully understand the possible sanctions and do not know what defense should be presented until the evidence is already closed.

68. The factual findings and final determination regarding responsibility is made by the hearing officer only after a live hearing, including the opportunity for cross-examination. *Id.*

69. At the hearing, the hearing officer is responsible for maintaining an orderly, fair, and respectful hearing. Ex. 1, § VII(C)(6).

70. CU Boulder Policy states that each party may bring one advisor of their choosing to the hearing to conduct cross-examination, with prior notice to the university that the advisor will attend. Ex. 1, § VII(C)(1).

71. CU Boulder Policy requires the Hearing Officer to permit each party's advisor to ask the other party and any witness all relevant questions and follow-up questions, including those challenging credibility. Ex. 1, § VII(C)(7).

72. CU Boulder Policy states that a party advisor may only ask a party or witness relevant questions, defined as a question that "seeks information that has any tendency to make the existence of any fact that is of consequence to the determination of the action

EXHIBIT A

more probable or less probable than it would be without the information sought in the question." Before the complainant, respondent, or witness answers a cross-examination or other questions, the hearing officer must first determine whether the question is relevant and explain any decision to exclude the question. Ex. 1, § VII(C)(8).

73. CU Boulder Policy states that the hearing officer cannot draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions. This can be a factor when determining whether the university has met its burden of proof. The hearing officer may consider any relevant prior statement of a party or witness, whether they submit to cross-examination at the live hearing or not, and the hearing officer decides how much weight to give prior statements. *Id.* § VII(C)(10).

74. CU Boulder Policy states that the hearing officer must apply the preponderance of the evidence standard when making findings of fact and conclusions.[7] A preponderance of the evidence exists when the totality of the evidence demonstrates that an allegation is more probably true than not. If the evidence weighs so evenly that the hearing officer is unable to say that there is a preponderance on either side, the hearing officer must determine that there is insufficient evidence to conclude that there has been a violation of the Policy. *Id.* § VII(C)(11).

75. The hearing officer must issue a written determination regarding responsibility and provide the determination to the parties simultaneously. The hearing officer must include the disciplinary sanction in the written determination, as determined by the sanctioning board. *Id.* § VII(C)(12), (13), (15).

[7] A minimum standard of "clear and convincing" should be required for expulsion due to the quasi-criminal nature of the charges and the significant lifetime consequences of the sanction. The Title IX Regulations define the clear and convincing evidence standard as meaning the decision-maker must determine whether it is "highly probable" that the alleged facts are true.

76. According to OIEC Resolution Procedures, the hearing officer determines "the credibility of parties and witnesses and the weight given to their statements, taking into consideration their means of knowledge, strength of memory and opportunities for observation, the reasonableness and unreasonableness of their statements, the consistency or lack of consistency of their statements, their motives, whether their statements are contradicted or supported by other evidence, any evidence of bias, prejudice or interest, and the person's manner and demeanor when providing statements." Ex. 2, § VII(D)(1)(e).

77. According to OIEC Resolution Procedures, possible sanctions available upon a finding of responsibility include, but are not limited to, warning/written reprimand, educational sanctions, formal disciplinary probation, restriction or denial of university services, delayed conferral of diploma or degree, suspension, exclusion, and expulsion. Ex. 2, § VII(D)(1)(e)(i).

78. Expulsions are rare in cases concerning intimate partner violence that are subject to OIEC Policy and Resolution Procedures. *See* Ex. 18; Ex. 19. Expulsion requires a student to permanently leave the university and includes an automatic exclusion from University of Colorado property. An expulsion decision results in the student being expelled from all campuses in the University of Colorado system. Importantly, a notation of "Expelled Responsible Sexual Misconduct" remains ***permanently*** on a student's transcript. Ex. 2, § VII(D)(1)(e)(i).

79. CU Boulder Policy permits either party to appeal a determination regarding responsibility. Both parties must have a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome. The decision-maker for the appeal (Appeal Board) must not be the same hearing officer that reached the determination regarding responsibility, investigator(s), or the Title IX Coordinator. The decision-maker for the appeal must be trained. The appeal decision-maker (Appeal Board) must issue a written decision describing the result of the appeal and the rationale for the result and the

written decision must be provided simultaneously to both parties. Ex. 1, § VII(D); Ex. 2, § VII(D)(1)(f).

80. According to CU Boulder's *Student Respondent Statistical Report*, in fiscal year 2021-2022, the OIEC received 41 allegations of dating or domestic violence. Ex. 18 at 7. Of those 41 allegations, 37 were addressed through remedies-based or other resolutions, and only ***three*** of the 41 allegations, including this case, were addressed through a formal grievance process. At the time the report was published, one of the three cases had resulted in a "Not Responsible" finding and two were still in progress, including this case. *See* Ex. 18 at 7. At the time of the report, the OIEC had issued ***zero*** expulsions for sexual misconduct, including dating violence, in fiscal year 2021-2022.[8] Ex. 18 at 8.

81. Similarly, in fiscal year 2022-2023, the OIEC received 31 allegations of dating or domestic violence. Ex. 19 at 6. Of those 31 allegations, 27 were addressed through remedies-based or other resolutions, and only four of the 31 allegations were addressed through a formal grievance process. At the time the report was published, only ***two*** cases were resolved through a "Responsible" finding that resulted in a sanction, including this case. While the 2022-2023 report fails to specify which sanction was applied in these two cases, *see* Ex. 19 at 6, one of the two cases resolved through a "Responsible" finding was Ms. Watson's case and Ms. Watson's sanction was expulsion. *See* Ex. 11 (Sanction Letter, dated August 4, 2022); *see also* Ex. 15 (Appeal Decision, dated October 19, 2022, upholding the sanction of expulsion).

## IV. The Investigation and Hearing

82. On February 9, 2022, Title IX Coordinator Defendant Pomeroy filed a Formal Complaint against Loulillian Watson pursuant to CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy. Ex. 5.

---

[8] As far as sanctions pursuant to the CU Boulder's Sexual Misconduct Policy, in fiscal year 2021-2022, the OIEC issued zero expulsions, three suspensions, four exclusions from all or specific areas of campus, two disciplinary holds, and four behavioral assessments. Ex. 18 at 8.

EXHIBIT A

83. On the same day, CU Boulder's OIEC issued Ms. Watson a Notice of Allegations and Interim Suspension. Ex. 6. The Notice was composed and signed by Defendant Bauer, Senior Investigator. The Notice was delivered to Ms. Watson at the Boulder County Jail.[9] The Notice informed Ms. Watson that she was being investigated for possible violations of CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy, specifically Dating Violence. The Notice stated that Ms. Watson was "presumed not responsible for the alleged conduct at this time." *Id.* at 2.

84. The Notice of Allegations and Interim Suspension also stated that the University had determined that Ms. Watson 's presence on campus posed an "immediate threat" and informed Ms. Watson of an interim suspension, effective immediately. Ex. 6 at 2; *see also* Ex. 4 (Safety Assessment and Risk Analysis for Emergency Removal of Individuals, completed by Defendant Tirella on February 8, 2022).

85. Ms. Watson did not ask for an advisor. But even if she had requested an advisor, the advisor would not have been appointed until evidence was closed and therefore an advisor would only be able to help her during the hearing. All evidence must be submitted prior to CU Boulder issuing the Final Investigative Report (FIR). CU Boulder will not appoint an advisor until after the FIR. Counsel represented Ms. Watson pro bono after consulting with Ms. Watson's public defender. This did not occur until after the FIR. Counsel requested more time to provide evidence and investigation, but the request was denied.

86. The OIEC investigation lasted less than a month – from February 14, 2022 until March 10, 2022. The OIEC investigation was led by Senior Investigator, Defendant Kate Bauer.

87. Neither Loulillian Watson nor John Doe participated in interviews with the OIEC regarding the incident.

---

[9] In Ms. Watson's criminal case, the District Attorney treated Ms. Watson more fairly, with an opportunity to prove she did not deserve lifelong consequences. Ms. Watson accepted a deferred sentence which was sealed after successful completion of Boulder 2022CR000195.

88. Defendant Bauer interviewed seven witnesses. *See* Exs. 20-26. All seven witnesses were affiliated with CU Boulder and/or CU Boulder's football program, including Lance Carl. Two potential witnesses – Doe's older brother and Ms. Watson's roommate in her on-campus residence hall – were unresponsive to OIEC's interview request. Ex. 8 at 3.

89. As part of the investigation, Defendant Bauer and the OIEC heavily relied upon the Boulder Police Department report related to the incident on February 2, 2022. Ex. 17. The OIEC failed to provide a fair and equitable investigation by not obtaining the entire police file, including body worn camera video that provided the tone and context of witness statements.

90. As part of the investigation, Defendant Bauer and the OIEC improperly focused on their own unrelated case file concerning a March 2021 situation involving both Ms. Watson and Doe. Ex. 8 at 3-4, 33-40.

91. Neither Ms. Watson nor Doe provided any information or documentation to Defendant Bauer or the OIEC during the investigation.

92. On April 12, 2022, just over two months after the incident at issue, Defendant Bauer and the OIEC issued a Preliminary Investigative Report (PIR) and investigative file to both Ms. Watson and Doe. Ex. 7. Neither Ms. Watson nor Doe provided a response to the PIR.

93. On April 28, 2022, just over two weeks after the PIR was issued, the OIEC issued a Final Investigative Report (FIR) and investigative file to both Ms. Watson and Doe. Ex. 8. Neither Ms. Watson nor Doe provided a response to the FIR.

94. According to the FIR, the "summary should not be construed as a comprehensive record of information provided to the OIEC. Rather, this summary is a synopsis of the relevant and material evidence provided to the OIEC during the course of the investigation as interpreted by the OIEC investigator." Ex. 8 at 3.

95. The FIR included summaries of both Ms. Watson's and Doe's statements to the Boulder Police Department (*id*. at 6-9; 12-13; 14-19), a summary of Boulder Police Department's search of Doe's apartment (*id*. at 9-12), a summary of Boulder Police Department's search of Doe's vehicle (*id*. at 13-14), a summary of Boulder Community Health's statement to Boulder Police Department (*id*. at 19-20), a summary a hospital video collected by Boulder Police Department (*id*. at 20); summaries of witness statements to the OIEC and Defendant Bauer (*id*. at 20-33); a summary of witness statements to the Boulder Police Department (*id.* at 29); and a summary of the unrelated incident that occurred in March 2021 (*id*. at 33-40).

96. According to the FIR, the investigative file included the Boulder Police Department's police report, the OIEC's interview notes and related correspondence, and records and audio recordings connected to the unrelated March 2021 incident. *See generally* Ex. 8. The investigative file did not include police body camera recordings. Defendant Bauer failed to collect police body camera recordings and instead relied on written police reports.[10] The investigative report did not include recordings or transcripts of the witness interviews.

97. The OIEC, Defendant Pomeroy, and Defendant Bauer failed to create an investigative report that fairly summarized the relevant evidence by omitting or disregarding relevant and material evidence.

98. CU Boulder Policy and OIEC Resolution Procedures mandate an investigative process where the university, and not the parties, holds both the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility.

[10] As argued in Ms. Watson's appeal (Ex. 13), the recording of Doe's initial interview with police supports her argument that W1 and W2 were directing Doe to say certain things. Specifically, a person can be heard whispering information for Doe to say to police and encouraging him to report even though he does not want to. This strongly supports that W1 and W2 helped Doe determine what to say and not to say prior to the interview and, more generally, controlled the narrative.

EXHIBIT A

Ex. 1 § VII(B); Ex. 2, § VII(D)(1)(c). The University, the OIEC, Defendant Pomeroy, and Defendant Bauer did not meet this burden.

99. The specific circumstances in this case prevented the University, the OIEC, Defendant Pomeroy, and Defendant Bauer from gathering evidence sufficient to reach a determination about the allegations. Ex. 2, § VII(D)(1)(b). Therefore, due to the lack of sufficient evidence in this case, the OIEC and Defendant Pomeroy were required to dismiss the formal complaint. The OIEC and Defendant Pomeroy failed to do so.

100. On June 8, 2022, a Notice of Hearing was sent to both Ms. Watson and Doe as well as any witnesses identified by the parties.[11]

101. On June 14, 2022, a Pre-Hearing Conferences was conducted by the Hearing Officer, Defendant Gushurst.

102. On June 17, 2022, a hearing was held before Defendant Gushurst for the purpose of cross-examination of the witnesses.

103. Ms. Watson appeared represented by a pro bono advisor. Doe did not appear, but his appointed advisor appeared. Neither Ms. Watson nor Doe testified at the hearing. At the time, Ms. Watson's criminal case based on the same facts had not been completed and Ms. Watson chose to exercise her right to remain silent under Colorado and federal Constitutional law.

104. CU Boulder's Sexual Misconduct Policy states that "[e]ach party may bring one advisor of their choosing to the live hearing to conduct cross-examination, with prior notice to the university that the advisor will attend and the advisor's name." Ex. 1, § VII(C)(1). Defendant Bauer was not a "party." Defendant Bauer was the Senior Investigator on this case.

---

[11] Plaintiff's request for witnesses was not timely submitted. As a result, neither Doe nor Lance Carl appeared at the hearing. In fact, other than Defendant Bauer, the Senior Investigator in this case, no other witnesses appeared at the hearing.

EXHIBIT A

105. The only witness that appeared at the hearing was Defendant Bauer, who was represented by a lawyer from CU Boulder's general counsel's office. Upon information and belief, Defendant Bauer's lawyer stifled full answers to cross examination and proper discussion of the facts. It is the University's burden to produce evidence sufficient to make a finding. Ex. 2, § VII(D)(1)(c). Here, CU Boulder's general counsel prevented Ms. Watson's attorney from presenting evidence. Applying the burden of proof and presumption of not responsible, this factor must weigh in favor of insufficient evidence to make a finding of responsibility.

106. Neither Lance Carl nor any of the other witnesses interviewed about the incident appeared at the hearing. Witnesses that are CU Boulder students or employees are encouraged to participate so the truth may be found at a hearing. The failure of the football staff to appear, combined with their significant involvement in the first report by Doe, should have been considered as part of the credibility assessment.

107. The Written Determination Regarding Responsibility, dated July 22, 2022, and signed by Defendant Gushurst, found Ms. Watson responsible for violating CU Boulder's Sexual Misconduct, Intimate Partner Violence, and Stalking Policy. Ex. 9; *see also* Ex. 10 (Notice of Written Determination, dated August 4, 2022).

108. In the Written Determination, Defendant Gushurst refused to consider that this incident was nothing more than an accident, failing to apply CU Boulder policy and procedure that a Respondent is presumed not responsible. Ex. 1, § VII(A)(4)(f); Ex. 2, § VII(D)(1)(c).[12] The burden of proof is on the University. Ex. 2, §VII(D)(1)(c) ("The

[12] The Colorado Supreme Court recently discussed the similar presumption of innocence in *People v. Vanderpauye*, 530 P.3d 1214, 1227 (Colo. 2023): "The chief problem with the prosecution's position is that it assumes Vanderpauye's guilt (i.e., it assumes that Vanderpauye did what the prosecution accuses him of doing). *If,* as the prosecution alleges, Vanderpauye had sexual intercourse with L.S. while she was physically helpless and while he knew she was physically helpless and didn't consent, then he would have foreseen that she might wake up, catch him in the act, and confront him about it, and her accusation would not have startled him. But that's a big *if.* More importantly, it's an improper *if* because it contravenes the presumption of innocence. *If*, consistent with the presumption of innocence, we assume that Vanderpauye did nothing

university, and not the parties, holds both the burden of proof and the burden of gathering sufficient evidence to reach a Determination Regarding Responsibility for Sexual Misconduct."); *see also* Ex. 2, §VII(D)(1)(e).

109. In the Written Determination, the Defendant Gushurst described "undisputed" facts that were, in fact, disputed. For example, Defendant Gushurst stated that Ms. Watson "made jabbing motions" towards Doe. Ex. 9 at 5. This is a disputed fact. The "jabbing" motions are suggestive of an intentional mental state. Ms. Watson and Doe say the cut was caused by accidental contact with Doe. Defendant Gushurst failed to apply the University's burden of proof and presumption of not responsible.

110. In the Written Determination, Defendant Gushurst omitted "undisputed" facts that were, in fact, undisputed. For example, Defendant Gushurst omitted the undisputed fact that Doe was holding a pair of scissors and threatening to cut up Ms. Watson's purse. Ex. 17 at 33, 74, 120, 167. A pair of scissors were found at the scene but not logged into evidence. Ex. 17 at 30, 71, 117, 164. Defendant Gushurst failed to consider Doe's actions during the incident and equally failed to consider Doe's inconsistent statement to coaches and staff after the incident, ignoring the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

111. Notably, both Ms. Watson and Doe agree that the incident was an accident. Ms. Watson told police multiple times that the incident was an accident. *See*, *e.g.*, Ex. 17 at 32-33. Ms. Watson told the public defender that the incident was an accident. *See* Ex. 16 (letter from Ms. Watson to public defender). Doe told the OIEC investigator that the incident was a mistake. Ex. 31 at 17. Doe told the Colorado State Public Defender multiple times that the incident was an accident and a mistake. Exs. 27, 28, 29. Doe wrote an Impact Statement to the Appeal Board expressly stating that his incident was an accident and nothing more.

---

illegal and that he engaged in sexual intercourse with L.S. after she consented to it, then he would not have foreseen that she'd accuse him of rape and her accusation would have been quite startling to him."

*See* Ex. 12 (Doe's impact statement). Defendant Gushurst completely failed to address these undisputed facts.

112. In the Written Determination, Defendant Gushurst completely disregarded Ms. Watson's account of the incident and her assertion that Doe was not truthful and had strong motivations to control the narrative of this incident. Defendant Gushurst failed to apply the University's burden of proof and presumption of not responsible.

113. In the Written Determination, Defendant Gushurst completely disregarded facts that were supportive of Ms. Watson, including Doe's provocation with scissors, Ms. Watson's attempts at first aid, and that Ms. Watson went to the hospital with Doe. Defendant Gushurst failed to apply the University's burden of proof and presumption of not responsible.

114. In the Written Determination, Defendant Gushurst found Doe's version of events credible despite Doe's multiple lies to coaches and medical staff. Defendant Gushurst failed to apply the University's burden of proof and presumption of not responsible.

115. According to OIEC Resolution Procedures, Defendant Gushurts was required to determine the credibility of parties and witnesses and the weight given to their statements, "taking into consideration their means of knowledge, strength of memory and opportunities for observation, the reasonableness and unreasonableness of their statements, the consistency or lack of consistency of their statements, their motives, whether their statements are contradicted or supported by other evidence, any evidence of bias, prejudice or interest, and the person's manner and demeanor when providing statements." Ex. 2, § VII(D)(1)(e).

116. In the Written Determination, Defendant Gushurst failed to make the required credibility determinations. Instead, Defendant Gushurst simply disregarded any evidence that Doe may have been motivated to be untruthful in his effort to appease his football coaches and protect his football career and simply found that Doe's motivation to

be untruthful had little connection or bearing on the case. Ex. 9 at 7. Defendant Gushurst ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

117. Defendant Gushurst placed no value on any of the credibility issues raised by Ms. Watson. Instead, Defendant Gushurst improperly discarded or ignored all of Ms. Watson's arguments with little or no discussion.

118. In the Written Determination, Defendant Gushurst failed to consider the multiple contradictions and inconsistent statements from the OIEC witness interviews, finding instead that "other witnesses interviewed by both police and the investigator substantially corroborated the same fact narrative." Ex. 9 at 5. This is simply untrue. *See*, *e.g.*, Exs. 20-26 (OIEC witness interview notes).

119. In the Written Determination, Defendant Gushurst failed to adequately determine the credibility of the parties and witnesses and the weight given to their statements and failed to explain why some witness statements were given more weight than others. Ex. 2, § VII(D)(1)(e). Defendant Gushurst ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

120. In the Written Determination, Defendant Gushurst found that Ms. Watson's "intent to stab is not at issue, only whether or not she actually stabbed Respondent is at issue." Ex. 9 at 6. As a result, Defendant Gushurst completely failed to consider Doe's provoking actions, the probability that Ms. Watson was defending herself, or any similar analysis. The fact that Ms. Watson did not intend to "stab" Doe is not only relevant, but of great significance for the determination of responsibility and the resulting sanction. Defendant Gushurst ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

121. In the Written Determination, Defendant Gushurst found that Ms. Watson's "intent to stab is not at issue," despite evidence in the record showing that the entire incident was an accident. Instead, Defendant Gushurst found that "only whether or not she actually stabbed" Doe was at issue. Ex 9 at 6. Defendant Gushurst arbitrarily and erroneously concluded that Ms. Watson "stabbed" Doe and that was all that mattered. Mitigating circumstances did not matter. The language used is language of intentional conduct. The Hearing Officer found the mental state of intentional, while indicating otherwise and refused to consider the lower mental state of accident.[13]

122. On the scale of mens rea, intentional acts are the highest level and hardest to prove. Mental state accident, mistake, negligence, gross negligence, recklessness, and knowing mens rea precede intentionally, in order. To find that Ms. Watson intentionally stabbed Doe, while presuming Ms. Watson not responsible, the University has the burden to prove by a preponderance a greater mental state than each lower mental state.

123. In the Written Determination, Defendant Gushurst speculated that because a 911 call was placed, but disconnected, Ms. Watson must have stolen Doe's phone to purposely delay medical treatment. Defendant Gushurst completely failed to consider any other explanations for the disconnected call, including Doe's actions and motivations for ending the call.

124. In the Written Determination, Defendant Gushurst concluded, without explanation, that Ms. Watson purposely delayed Doe's medical treatment "until he agreed to her demands that he not call the police." Ex. 9 at 7. Yet witness statements, including statements from Doe himself, do not support this finding. *See*, *e.g.*, Exs. 27-29. The Hearing

[13] It must be assumed that a person could be cut by a knife held by an intimate partner without the person holding the knife violating the Sexual Misconduct Policy. For example, if a partner is cutting vegetables at the counter and the other person comes up to give a hug, but in the innocent circumstance of this unexpected action, they are cut, a finding that mental state is "immaterial" provides grounds for the absurd result of a victim of sexual assault being responsible.

Officer ignored the presumption of not responsible and the University's burden of gathering sufficient evidence to reach a determination.

125. In the Written Determination, Defendant Gushurst erroneously found that witnesses interviewed by both the police and the investigator substantially corroborated the same fact narrative. Ex. 9 at 5. However, multiple discrepancies can be found throughout the witness interviews, including discrepancies between narratives provide by Doe.

126. In the Written Determination, Defendant Gushurst found that there was "some dispute about" whether Ms. Watson took Doe's phone and delayed medical treatment. Ex. 9 at 7. Yet, with absolutely no support or evidence, Defendant Gushurst unreasonably determined that Ms. Watson took Doe's phone for the specific purpose of delaying medical treatment. Indeed, the only evidence Defendant Gushurst cited in support of the finding was a disconnected 911 call. Defendant Gushurst failed to apply the University's burden of proof and presumption of not responsible.

127. On the same day as the Notice of Written Determination, the Sanctioning Board, led by the Chair, Defendant Tirella, issued Ms. Watson a Sanction Letter, dated August 4, 2022. Ex. 11. In the Sanction Letter, Defendant Tirella informed Ms. Watson that she was permanently expelled from CU Boulder and excluded from all University of Colorado campuses.

128. According to the Sanction Letter, the Board, led by Defendant Tirella, arbitrarily and erroneously determined that the "conduct was severe and that it escalated from the stabbing to preventing medical treatment." The Board considered this an aggravating factor. *Id*. at 2. There is no evidence that Ms. Watson prevented medical treatment. Instead, the evidence shows that Ms. Watson went to the hospital with Doe.

129. According to the Sanction Letter, the Board, led by Defendant Tirella, arbitrarily and erroneously "assessed the impact on complainant to be high." The Board considered this an aggravating factor. *Id*. Notably, in her Appeal, Ms. Watson submitted

EXHIBIT A

Doe's impact statement stating that that injury had not affected his ability or performance and had "minimal effects." Ex. 12. Doe also stated that Ms. Watson "did not intend to injure," it was "an accident," and he did not want Ms. Watson to be expelled from CU Boulder. *Id*. at 2.

130. According to the Sanction Letter, the Board, led by Defendant Tirella, arbitrarily and erroneously determined the ongoing safety risk to the complainant and the CU Boulder community to be "moderate," explaining that Ms. Watson stated that she will sign up for domestic violence classes, but there was no evidence that she had done so yet. The Board considered this an aggravating factor. Ex. 11. Notably, in her Appeal, Ms. Watson provided evidence that she had enrolled in and attended domestic violence classes. *See* Ex. 13.

131. According to the Sanction Letter, the Board, led by Defendant Tirella, arbitrarily and erroneously decided to permanently expel Ms. Watson from the University of Colorado. The letter states that "the sanction in this case will not go into effect until either the deadline for filing an appeal, August 11, 2022, passes, and no appeal is filed or, if a timely appeal is filed, the appeal is decided, whichever comes first." Ex. 11 at 3.

**V. The Appeal**

132. Ms. Watson submitted a timely Appeal on August 24, 2022. Ex. 13; Ex. 14.

133. The Appeal presented new evidence that was unavailable during the initial investigation, including an impact statement from Doe, dated August 7, 2022. *See* Ex. 12. Doe's impact statement was especially relevant considering Defendant Tirella's assessment finding that the impact of the incident on Doe was "high." Ex. 11 at 2. Doe's impact statement says otherwise and specifically states that the injury had "minimal effects" on Doe and CU Boulder's decision to expel Ms. Watson was "excessive" and should be reconsidered. Ex. 12 at 1.

134. The Appeal presented new evidence obtained from police body camera recordings, evidence the OIEC failed to collect during the investigation. As part of the investigation, the OIEC relied solely on written police reports. This new evidence strongly supports Ms. Watson's assertion that witnesses may have encouraged Doe to falsely report the incident to protect both his academic aspirations and potential career in professional football. Ex. 13 at 2-3.

135. The Appeal presented new evidence that Ms. Watson enrolled and attended domestic violence classes, information provided to Defendant Tirella but not completed until after Ms. Watson's expulsion. Ex. 13 at 3.

136. The Appeal asserted due process errors, including failure to provide a fair hearing that included cross examination of the witnesses, failure to apply the correct standard of proof, incorrectly applying the burden of production, failure to properly assess credibility, and multiple other due process errors. Ex. 13 at 3-8.

137. The Appeal asserted that the OIEC investigators had a conflict of interest and exhibited unfair bias that materially affected the outcome of the investigation, demonstrated by the OIEC's failure the investigate or address Doe's code violations and Defendant Bauer's representation by CU Boulder's general counsel. Ex. 13 at 8-9.

138. The Appeal Decision, dated October 19, 2022, upheld the Written Determination and Sanctions in their entirety. Ex. 15.

139. The Appeal Decision contained multiple errors and either completely ignored or gave little consideration to most, if not all, of Ms. Watson's assertions in the Appeal.

140. For example, the Appeal Decision wrongly states that the Written Determination was based on Witness 5's statement to Boulder Police Department. Ex. 15 at 8. However, Witness 5's statement is neither relevant to nor referenced in the Written Determination. Indeed, Witness 5's statement primarily discusses Doe's initial lies to staff and coaches about his condition. *See* Ex. 24.

EXHIBIT A

141. Yet another error occurs in the Appeal Board's finding concerning conflict of interest and unfair bias. Ex. 15 at 9. Here, in responding to Ms. Watson's assertion concerning failure to investigate in this case, the Appeal Board states that Ms. Watson "met with the OIEC investigator on this case on March 23, 2021 and indicated she did not wish to provide any information to the investigator . . . ." Ex. 15 at 9. However, this date references a prior unrelated situation from March 2021 and not the incident that occurred on February 2, 2022. The Appeal Board used this statement to simply discard any evidence that Ms. Watson's statements concerning Doe's actions and threats against her were relevant to the case. Ex. 15 at 9 ("While there was information in the file that Respondent told [Boulder Police Department] that Complainant took Respondent's purse, threatened her purse (which she equated to threats against her) and 'threatened' her, there was no more information available . . .").

142. Moreover, the Appeal Board found that Defendant's Bauer's appearance at the Hearing with an advisor, specifically CU Boulder general counsel, was completely normal and not a conflict of interest or bias because the "hearing manual specifically states that witnesses may appear with counsel." Ex. 15 at 10 (notably, without citing to any source, including a hearing manual). While it is true that a ***party*** "may bring one advisor of their choosing . . . with prior notice," *see* Ex. 1, § VII(C)(1); *see also* Ex. 2, § VII(D)(1)(e), the same is not true for a Senior Investigator, who is not a party in the case, especially without any notice to the parties.

143. The Appeal Board did not allow new evidence, including a statement of mitigation provided by Doe that was not reasonably available at the time of the Determination of Responsibility. Ex. 12; *see also* Ex. 2 (including as a basis for appeal "new evidence that was not reasonably available at the time of the Determination"). According to the Appeal Decision, the impact statement provided by Doe was not new evidence because Doe could have submitted it previously, a very strict interpretation of the rule. The

EXHIBIT A

University applied this rule very differently on February 15, 2023, when Deputy Title IX Coordinator Megan Clark failed to analyze an objection to an appeal based on "new evidence" submitted by a Complainant that could have submitted prior to the Determination in that case.[14] There, the "new evidence" cited for the decision consisted solely of the thoughts and feelings of the Complainant, and nothing else. Complainant did not provide any argument for why this evidence was new or was not reasonably available prior to the Determination. There was no finding by the University. Respondent objected to no avail. The dismissed case was reinstated after appeal and is currently awaiting resolution by a hearing officer.

144. These examples, among others, demonstrate that the Appeal Board did not take this case seriously, failed to review evidence, and simply rubber stamped Defendant Gushurst's Written Determination. Ms. Watson deserves better and the law demands it.

**COUNT I**

**VIOLATION OF 42 U.S.C. § 1983**
**(Against All Individual Defendants)**

145. Plaintiff repeats and incorporates all the allegations of this Complaint as if fully set forth herein.

146. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1.

147. Defendant CU Boulder is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment. CU Boulder, the Board, and the Individual Defendants, as state actors, are therefore bound by the requirements of the United States Constitution.

[14] *NS v. BS*, Case No. 00083444, *Objection to the Granting of Complainant's Appeal and Request to Reinstate Dismissal Based on Deputy Title IX Coordinator Using the Wrong Resolution Procedure and Complainant's Failure to Comply with Appeal Rules on New Evidence*.

148. CU Boulder and the Board, as public institutions established by the State of Colorado, as well as the Individual Defendants, as agents of the University and individually, have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University and the Constitution of the State of Colorado.

149. Fourteenth Amendment due process protections are required in higher education disciplinary proceedings. When it comes to due process, the "opportunity to be heard" is the constitutional minimum. *Messeri v. Distefano*, 480 F. Supp. 3d 1157, 1164 (D. Colo. 2020).

150. Plaintiff has a strong interest in completing her education and avoiding mistaken expulsion from the University. *See Goss v. Lopez*, 419 U.S. 545, 579 (1975). ("The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences."); *Siblerud v. Colo. State Bd. of Agric.*, 896 F. Supp. 1506. 1516 (D. Colo. 1995) ("[Plaintiff] faced expulsion; therefore, his private interest was exceptionally robust.").

151. Where a student at a public university faces expulsion through a disciplinary proceeding, a serious property interest is at stake; expulsion will have a lasting negative impact on the student's life, so heightened due process protections, including a hearing with the right to present evidence, cross-examine adversarial witnesses, and to call witnesses is required. *Goss*, 417 U.S. at 583; *Brown v. Univ. of Kansas*, 599 F. App'x 833, 837 (10th Cir. 2015); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001); *Messeri v. Univ. of Colorado, Boulder*, No. 18-cv-2658-WJM-SKC, 2019 WL 4597875, at *17-18 (D. Colo. Sept. 23, 2019); *see also Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F3d 393, 402-04 (6th Cir. 2017).

152. Plaintiff faced disciplinary action that included the possibility of expulsion. Accordingly, the due process provisions of the Fourteenth Amendment applied to the

disciplinary process utilized in Plaintiff's case, and Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions she was facing.

153. It is well established that a person has a protected property interest in pursuing and continuing her education, as well as in future educational and employment opportunities and occupational liberty, of which she cannot be deprived without due process.

154. It is also well established that a person has a protected liberty interest in her good name, reputation, honor, and integrity, of which she cannot be deprived without due process.

155. Plaintiff's constitutionally protected property interest in her continued enrollment at CU-Boulder, and her right to be free from arbitrary dismissal, derives from the policies, courses of conduct, practices, and understanding established by CU Boulder, as well as the express and implied contractual relationship between the University and Plaintiff.

156. In consideration of the foregoing assurances, CU Boulder's policies created a property right in Plaintiff's continued enrollment with the University, and a contractual right to protection against arbitrary dismissal.

157. Plaintiff has a constitutionally protected liberty interest because the allegations brought against Plaintiff ultimately resulted in an expulsion from CU Boulder, a sanction that will have significant and lifelong ramifications with respect to her education, employment, and reputation.

158. Plaintiff was wrongly held responsible for violating CU Boulder's sexual misconduct policy, a charge that by its nature implies "the existence of serious character defects such as dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006).

159. In this case, there is no question that Plaintiff had a protected property interest in pursuing and continuing her education, as well as in future education and employment opportunities and a protected liberty interest in her good name, reputation, honor, and integrity.

160. In this case, there is no question that Plaintiff's ultimate expulsion and the permanent notation on her transcript expressly stating that she was found responsible for violating CU Boulder's Sexual Misconduct, Intimate Partner Violence and Stalking Policy harmed and continues to harm her good name, reputation, honor, and integrity.

161. In this case, there is no question that the University failed to afford Plaintiff the minimum procedural safeguards required by due process before imposing a permanent expulsion.

162. In this case, there is no question that the University failed to apply greater procedural safeguards to Plaintiff when it was considering an action that was disciplinary rather than academic. *See Harris v. Blake*, 798 F.3d 419, 423 (10th Cir. 1986).

163. When a university considers expulsion, it must use procedures accounting for the conflicting interests – the student's interest in unfair or mistaken expulsion from the educational process and the school's interest in discipline and order. *Watson ex. rel. Watson v. Beckel*, 424 F.3d 1237, 1240 (10th Cir. 2001). CU Boulder failed to do so.

164. This case involved very serious allegations and therefore the risk to Plaintiff of unfair expulsion was extremely high, yet the University failed to apply heightened due process protections to Plaintiff's case.[15]

[15] Scholars have contemplated the specifics of what procedural rights students facing long-term suspension or expulsion may be entitled to, including discovery rights, the right to cross-examination, the right to counsel, the right to appeal, and the right to a record of the hearing, among others. *See*, *e.g.*, Diana Newmark, *The Illusion of Due Process in School Discipline*, 32 W&M BILL OF RTS. J. 343 (2023); Tamara Rice Lave, *Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases*, 48 ARIZ. ST. L.J. 637 (2013); *see also Marie T. Reilly, Due Process in Public University Discipline Cases*, 120 PA. ST. L. REV. 1001, 1010-22 (2016).

165. CU Boulder has a constitutional obligation to provide a fundamentally fair and reliable process.

166. Plaintiff is entitled, under the Constitution of the United States, to the opportunity to be heard in a meaningful manner.

167. Plaintiff's interest in the outcome of the investigation and adjudication is significant, and including (i) expulsion from CU Boulder denied Plaintiff the benefits of education at her chosen school; (ii) expulsion damaged and continues to damage Plaintiff's academic and professional reputation; (iii) a finding of responsibility damaged and continues to damage Plaintiff's personal reputation; and (iv) expulsion prevented Plaintiff from re-enrolling at CU Boulder and impair her ability to enroll at a different institution, thus impairing Plaintiff's ability to pursue higher educational and career prospects.

168. Plaintiff was deprived of a meaningful opportunity to be heard before she was expelled from CU Boulder.

169. Plaintiff was deprived of a meaningful opportunity to be heard when the Defendant Pomeroy, Defendant Bauer, and Defendant Gushurst placed the burden of proof on the Plaintiff and presumed her guilty before the disciplinary process was complete. The burden of proof in establishing a determination regarding responsibility with respect to allegations in a formal complaint rests with the University.

170. Plaintiff was deprived of a meaningful opportunity to be heard when Defendant Bauer failed to obtain the police body camera footage – footage that supported Plaintiff's narrative.

171. Plaintiff was deprived a meaningful opportunity to be heard when Defendant Pomeroy, Defendant Bauer, and Defendant Gushurst refused to consider Plaintiff's statements that she did not intend to hurt or cut Doe. Defendant Tirella compounded this issue by refusing to consider lack of intent when determining Plaintiff's sanction.

172. Plaintiff was deprived a meaningful opportunity to be heard when Defendant Pomeroy, Defendant Bauer, and Defendant Gushurst refused to consider Plaintiff's statements regarding Doe's provoking actions and the probability that Plaintiff was simply defending herself.

173. Plaintiff was deprived of a meaningful opportunity to be heard when Defendant Pomeroy, Defendant Bauer, Defendant Gushurst, and Defendant Tirella all ignored the Plaintiff's statements that Doe was holding a pair of scissors and threatening to cut up Plaintiff's purse when the incident occurred. A pair of scissors were found at the scene, but this fact was disregarded.

174. Plaintiff was deprived of a meaningful opportunity to be heard when the Defendant Pomeroy, Defendant Bauer, and Defendant Gushurst demonstrated clear bias against her during the investigation because she was a black woman and did not have the resources or the influence of the CU Boulder football team.

175. Plaintiff was deprived of a meaningful opportunity to be heard when Defendant Gushurst failed to give any negative inference or weight to the conflicting narratives provided by Doe and several members of the CU Boulder football staff and coaches.

176. Plaintiff was deprived of a meaningful opportunity to be heard when, in determining Plaintiff's sanction, Defendant Tirella misconstrued Plaintiff's impact statement, misstated multiple facts, and misapplied the sanctioning factors set forth in the OIEC Resolution Procedures.

177. Plaintiff was deprived of a meaningful opportunity to be heard when Defendant Pomeroy, Defendant Bauer, Defendant Gushurst, and Defendant Tirella completely failed to consider the undisputed fact that this entire incident was an accident.

178. Plaintiff was deprived of a meaningful opportunity to be heard when she expelled despite the undisputed fact that Doe told multiple people that this entire incident

was an accident. Both Doe and Ms. Watson agree that the incident was an accident. Plaintiff told police multiple times that the incident was an accident. *See*, *e.g*., Ex. 17 at 32-33. Plaintiff told the public defender that the incident was an accident. *See* Ex. 16 (letter from Ms. Watson to public defender). Doe told the OIEC investigator that the incident was a mistake. Ex. 31 at 17. Doe told the Colorado State Public Defender multiple times that the incident was an accident and a mistake. Exs. 27, 28, 29. Doe wrote an Impact Statement to the Appeal Board expressly stating that his incident was an accident and nothing more. *See* Ex. 12 (Doe's impact statement).

179. Plaintiff was denied a meaningful opportunity to be heard when the Individual Defendants failed to provide her with the opportunity to cross-examine witnesses, including Doe, Lance Carl, or any of the witnesses interviewed by police and Defendant Bauer.

180. Plaintiff was denied a meaningful opportunity to be heard when Defendant Gushurst arbitrarily and erroneously found that Plaintiff's "intent to stab is not at issue; only whether or not she actually stabbed [Doe] is at issue." Ex. 9 at 6.

181. Plaintiff was denied a meaningful opportunity to be heard when Defendant Gushurst erroneously found that all of the witnesses substantially corroborated the same fact narrative, and ignored the multiple discrepancies found throughout the witness interviews, including discrepancies between narratives provide by Doe.

182. Plaintiff was not provided with a fundamentally fair and unbiased hearing and resolution process.

183. "A fundamental principle of procedural due process is a hearing before an impartial tribunal." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998). "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." *Id*.

184. Defendant Gushurst was biased with respect to the factual issues being adjudicated when she permitted Defendant Bauer to appear at the hearing with University counsel.

185. Defendant Gushurst was biased with respect to the factual issues being adjudicated when she found that the police report was based upon interviews with three witnesses "who had direct knowledge of the relevant facts." Ex. 9 at 5. The only witnesses with "direct knowledge of the relevant facts" were Plaintiff and Doe and neither Plaintiff nor Doe participated in the investigation. The only witnesses with direct knowledge of the relevant facts referred to the incident as both an "accident" and a "mistake." Defendant Gushurst ignored this relevant fact.

186. In the Written Determination, Defendant Gushurst was biased with respect to the factual issue being adjudicated when she (1) described and relied upon undisputed facts that were, in fact, disputed; (2) ignored Plaintiff's narrative of the incident; (3) ignored Plaintiff's argument that Doe was not truthful and had strong motivations to control the narrative; (4) disregarded facts that were supportive of Plaintiff, including Doe's provocation with scissors, Plaintiff's attempts at first aid, and that Plaintiff went with Doe to the hospital; and failed to adequately make any credibility; (5) failed to adequately make any credibility determinations; (6) found that Plaintiff's "intent" was not at issue, despite the relevant fact that both Plaintiff and Doe agreed that this entire incident was a "mistake" or "accident"; (7) found that witnesses interviewed corroborated the same fact narrative despite multiple discrepancies;  and (8) refused to consider other reasons why the 911 call may have been disconnected.

187. Moreover, this case turns almost entirely on witness credibility, yet Ms. Watson had no opportunity to "probe the witnesses' stories to test their memories or potential ulterior motives, or to observe witnesses' demeanor" because none of the witnesses appeared at the hearing. *See Messeri*, 480 F. Supp. 3d at 1165; *see also Doe v.*

*Baum*, 903 F.3d 575, 581 (6th Cir. 2018 (recognizing that "written statements cannot substitute for cross-examination"); *Lee v. Univ. of New Mexico*, 449 F. Supp. 3d 1071, 1126-28 (D.N.M. 2020) (recognizing plaintiff was deprived of a meaningful opportunity to be heard where the university did not allow for any cross-examination).

188. Defendant Pomeroy, Defendant Bauer, Defendant Gushurst, and Defendant Tirella, in their individual capacities, acted intentionally and with callous disregard for Doe's clearly established constitutional rights.

189. Defendant Schwartz, in his official capacity, is the direct supervisor of the CU Boulder OIEC. Defendant Schwartz is responsible for issuing sanctions and initiating disciplinary notations on transcripts. Therefore, according to University counsel, he is the proper party to implement the relief Plaintiff seeks*. See Doe v. Univ. of Colorado at Boulder*, 255 F. Supp. 3d 1064. 1082-83 (D. Colo. 2017).

190. By denying Plaintiff her good reputation, taking away her right to a public education, and showing reckless or callous indifference to Plaintiff's federal protected rights, Defendants intentionally, willfully, wantonly, oppressively, and maliciously violated Plaintiff's due process rights.

191. Defendants disregarded clearly established due process rights of student is disciplinary proceedings by depriving Plaintiff of the requisite due process and by depriving Plaintiff of her property interest in public education an dliberty interest in her good name and reputation.

192. Defendant Pomeroy, Defendant Bauer, Defendant Gushurst, and Defendant Tirella's actions against Plaintiff have caused and continue to cause substantial, immediate, and continuing damage to her, including prejudicing her acceptance into other academic institutions, diminishing her reputation, and causing undeniable anxiety and depression.

193. Without regard for Plaintiff's due process rights, the Defendants individually and collectively engaged in investigatory and adjudicatory processes that resulted in the improper expulsion of Plaintiff from the University.

194. As fully detailed above, the unlawful actions taken by Defendant Pomeroy, Defendant Bauer, Defendant Gushurst, and Defendant Tirella, acting in their individual capacities, were motivated by a malicious motive or intent or, at the very least, reckless or callous indifference to Plaintiff's right to due process warranting an award of punitive damages to Plaintiff.

195. In addition, as part of this action, Plaintiff seeks prospective injunctive relief against Defendant Schwartz in his official capacity. The Supreme Court's *Ex parte Young* decision instructs that Eleventh Amendment immunity does not bar a plaintiff's request for prospective injunctive relief or declaratory judgment against a state actor named in their official capacity. *See generally Ex parte Young*, 209 U.S. 123, 150-156 (1908); *see also Doe v. University of Colorado, Boulder*, 255 F.Supp.3d 1064,1082-83 (D. Colo. 2017).

196. As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future education and career opportunities, reputational damage, economic injuries, and other direct and consequential damages.

197. As a result of the foregoing, Plaintiff has standing to seek, and is entitled to, an injunction (a) vacating the disciplinary findings and decisions; (b) granting an expungement of Plaintiff's disciplinary record; (c) removing any record of Plaintiff's expulsion from her education file; and (d) permanently destroying any record of these allegations.

198. As a result of the foregoing, Plaintiff is also entitled to have any record of the investigation and subsequent sanction expunged from her academic record, removing any

EXHIBIT A

reference to the expulsion from her academic file and destroying all records pertaining to the investigation, and to have her identity remain confidential.

199. As a result of the foregoing, Plaintiff is entitled to prospective injunctive relief against Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

**COUNT II**

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**(Against CU Boulder)**

200. Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

201. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

202. The statute expressly provides for enforcement by the government, *see id*. § 1682, but the Supreme Court has recognized an implied private right of action for injunctive relief and monetary damages. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979); *see also Doe v. Univ. of Denver*, 1 F4th 822, 828 (10th Cir. 2021) (citing *Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 173 (2005) and finding that "[w]here sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available").

203. Title IX applies to schools, local and state educational agencies, and other institutions that receive federal financial assistance from the U.S. Department of Education, including CU Boulder.

204. CU Boulder is required to comply with applicable state and federal statutes, including Title IX.

205. Students attending public universities, including CU Boulder, who have been accused of sexual misconduct, have a right to due process under Title IX.

206. On May 6, 2020, the U.S. Department of Education released new Title IX regulations, which carried the force and effect of law as of August 14, 2020.

207. The Title IX regulations provide respondents certain procedural rights, including the following: (i) a presumption of innocence until a finding of responsibility is made at the conclusion of the process; (ii) the right to review evidence directly related to the allegations with at least ten (10) days to review and respond; (iii) the right to review an investigative report that fairly summarizes relevant evidence and a minimum of ten (10) days to respond to that investigative report; (iv) an assurance that Title IX personnel are free from conflicts of interest and bias; (v) the burden of gathering evidence and burden of proof must remain on schools, not the parties; (vi) equal opportunity for the parties to present fact and expert witnesses and other inculpatory and exculpatory evidence; (vii) objective evaluation of all relevant evidence, inculpatory and exculpatory, and avoid credibility determinations based on a person's status; and (viii) the right to a live hearing in which each party's advisor may ask the other party and any witnesses all relevant questions, including those challenging credibility, with such cross-examination to be conducted directly, orally, and in real time.[16]

208. Students attending public universities such as CU Boulder who have been accused of sexual misconduct have a right to due process under Title IX.

[16] *See Summary of Major Provisions of the Department of Education's Title IX Final Rule*, https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/titleix-summary.pdf.

209. A university's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment, such as dating violence, "may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a).

210. Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

211. A person accused of sexual misconduct who alleges that the University discriminated through improper discipline or sanctions may state a Title IX claim by alleging that the university discriminated on the basis of the plaintiff's sex when disciplining the plaintiff. In such cases, a respondent may establish a Title IX violation based on either an official action or deliberate indifference.

212. Official action refers to cases where a university's official policies, procedures, or disciplinary actions themselves are discriminatory based on sex. If the university's rules are demonstrably biased against individuals of a certain sex, or if the disciplinary process was not applied fairly to all students regardless of sex, this could constitute an official action violation Title IX.

213. Fairness and neutrality in the grievance process are critical to ensure that all students are treated equitably. Procedural protections, such as the right to be presumed innocent, the opportunity for a hearing and cross-examination, and access to evidence are vital for ensuring fair and accurate determinations of responsibility.

214. Plaintiff was denied the procedural protections vital for ensuring fair and accurate determinations of responsibility and was not treated equitably when

i. Plaintiff was not presumed innocent throughout the disciplinary process.

ii. Plaintiff was not provided with a fair and unbiased investigation.

iii. Plaintiff was not provided the opportunity for a fair and equitable hearing that included cross-examination.

EXHIBIT A

iv. Plaintiff was denied a meaningful opportunity to be heard throughout the disciplinary process.

v. The University and the OIEC improperly placed the burden of proof on Plaintiff.

vi. The University and the OIEC improperly ignored the presumption of the responsible.

vii. The University and the OIEC failed to provide a fair, equitable and impartial resolution, as required by the OIEC Resolution Procedures.

viii. The University and the OIEC failed to provide a hearing with cross examination of witnesses, including "Complainant," John Doe.

ix. The University and the OIEC failed to collect police body camera recordings and the full police investigative file, which was available from the Boulder Police Department in mid-February 2022.

x. The University and the OIEC improperly permitted Defendant Bauer to be represented at the hearing by CU Boulder general counsel.

xi. The University and the OIEC failed to afford any weight to Plaintiff's narrative.

xii. The University and the OIEC failed to consider Doe's motivations to tell police something other than the truth.

xiii. The University and the OIEC failed to consider evidence that Doe feared retaliation from the CU Boulder football coaches and staff if the truth of the incident came out.

xiv. The University and the OIEC failed to consider evidence that Doe followed the advice of CU Boulder football coaches and staff because he feared potential consequences for his actions, including his football career at CU and his future football career.

EXHIBIT A

xv. The University and the OIEC prejudiced Plaintiff by relying on an unrelated incident in March 2021 that was not fully investigated to make inferences in this case.

xvi. The University and the OIEC prejudiced Plaintiff by erroneously drawing an adverse inference about Plaintiff's refusal to take part in the investigation or testify at the hearing while failing to give any weight to the fact that Doe did not submit the Complaint against Plaintiff and refused to take part in the investigation or appear at the hearing.

xvii. The University and the OIEC denied Plaintiff a fair hearing before an impartial and unbiased decisionmaker.

xviii. The University and the OIEC displayed bias against Plaintiff by finding credible the version of events provided by CU Boulder football staff and coaches and completely ignoring multiple conflicting statements by CU Boulder football staff and coaches.

xix. The University and the OIEC displayed bias against Plaintiff by failing to consider motivations of CU Boulder football staff and coaches to encourage a false and incomplete narrative.

xx. The University and the OIEC displayed bias against Plaintiff by issuing an unwarranted and lifelong sanction for an accident that did not cause any lasting harm.

xxi. The University and the OIEC displayed bias against Plaintiff by failing to treat Plaintiff the same as other similarly situated students.

xxii. The University and the OIEC displayed bias against Plaintiff by failing to fully and properly consider Plaintiff's appeal.

xxiii. The University and the OIEC displayed bias against Plaintiff by failing to consider new evidence included in Plaintiff's appeal, including Doe's impact statement and police body camera recordings.

xxiv. The University and the OIEC displayed bias against Plaintiff by failing to credit Plaintiff's efforts to enroll in and attend domestic violence classes.

215. Plaintiff alleges that Defendants affirmatively discriminated on the basis of sex in its own official actions leading to the imposition of her expulsion. CU Boulder's official policies, procedures, and disciplinary actions themselves are discriminatory based on sex and CU Boulder's actions in applying it discriminatory discipline against Plaintiff constituted official sex-based discrimination, and as a result, Plaintiff was denied a fair and equitable educational experience.

216. The procedural flaws suggest that the disciplinary action against Plaintiff was erroneously or selectively imposed, and thus indicate the presence of discrimination, and the additional evidence allows the inference that the discrimination was based on sex.

217. An allegation of sexual misconduct is a serious accusation with lifelong implications for any respondent, including Plaintiff. A rational finder of fact could infer that CU Boulder's allegations, based on conflicting reports, were based on Plaintiff's sex and that the sham investigation that followed was motivated by the University's desire to protect its reputation and the reputation of CU Boulder's football program. Plaintiff alleges that she was targeted by the discriminatory accusations of sexual misconduct, and CU Boulder imposed the harsh sanction of expulsion under circumstances that indicate a deliberate indifference to the truth of what actually occurred, including that the incident was simply an accident.

218. Title IX may be violated by a school's imposition of university discipline where gender is the motivating factor in the decision to discipline.

EXHIBIT A

219. Challenges to university disciplinary proceedings for sex discrimination can fall into the following two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

220. The Tenth Circuit has framed the question for summary judgment as, "Could a reasonable jury – presented with the facts alleged – find that sex was a motivating factor in the university's disciplinary decision?" *Doe v. DU*, 1 F. 4th 822, 830 (10th Cir. 2021).

221. CU Boulder engaged in "selective enforcement." Regardless of Plaintiff's guilt or innocence, the severity of the penalty of expulsion and/or the decision to initiate the proceeding against Plaintiff in the first place was affected by Ms. Watson's gender.

222. An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was innocent and wrongly found to have committed an offense because the incident at issue was an accident. Gender bias was a motivating factor behind the erroneous findings.

223. Plaintiff was not provided with adequate due process protections, including but not limited to a fair and impartial process, a thorough and complete investigation, proper evaluation of witness credibility, motivation, and intent, proper placement of the burden of production on the university, and the presumption of innocence, as shown by the actions of CU Boulder's investigator, hearing officer, sanctioning committee, and appeal board.

224. Upon information and belief, male students at CU Boulder found responsible for violent assaults that result in life altering injuries have suffered only minor sanctions despite the severity of their policy violations. Indeed, in 2022, a CU Boulder football team member, a white male, was not expelled from the university despite punching a good

EXHIBIT A

Samaritan about 30 times, causing a fractured skull, internal brain bleeding, and permanent damage.[17]

225. Moreover, CU Boulder's student respondent statistical reports demonstrate that students are rarely, if ever, expelled after being found responsible for dating violence. *See*, *supra*, ¶¶ 80, 81.

226. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX that found her responsible for sexual misconduct and punished severely for it.

227. As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

228. As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the expulsion from her education file, and destroying any and all records pertaining to the investigation.

229. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

//

//

//

---

[17] *See, e.g., Former CU Buff lineman Carson Lee sentenced to 30 days in jail for assault*, Daily Camera, https://www.dailycamera.com/2022/05/19/former-cu-buff-lineman-carson-lee-sentenced-to-30-days-in-jail-for-assault/# (noting that, following a violent assault that resulted in the victim suffering a fractured skull and internal brain bleeding after being punched around 30 times, Lee, the white, male student responsible, was merely suspended from CU Boulder and allowed to transfer to a new school without any permanent damage to his education, reputation, or future).

EXHIBIT A

**COUNT III**

**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**(Against CU Boulder)**

230. Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

231. This Count is brought against CU Boulder.

232. In 1964, President Lyndon B. Johnson signed the landmark Civil Rights Act of 1964. Included among the Civil Rights Act's eleven titles is Title VI, codified at 42 U.S.C. §§ 2000d *et seq*. Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs that receive federal financial assistance.

233. Title VI of the Civil Rights Act of 1964 states that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

234. Title VI of the Civil Rights Act of 1964 prohibits recipients of federal funding, including CU Boulder, from discriminating on the basis of race, color, or national origin. *Id.*; *see also* 34 C.F.R. Part 100 (implementing regulations).

235. The Department of Education's Office of Civil Rights (OCR) is entrusted with enforcing Title VI in federally funded schools.

236. The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001)).

237. The U.S. Supreme Court has described the objectives of Title VI as twofold: (1) to "avoid the use of federal resources to support discriminatory practices"; and (2) "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

238. Section 601 of Title VI bars discrimination based on race, color, or national origin in federally funded programs. 42 U.S.C. § 2000d. Individuals subjected to discrimination in such a program can sue a recipient to enforce Section 601. In such cases, the Supreme Court has read the statute to bar only intentional discrimination that violates the Constitution's Equal Protection Clause. *Alexander v. Sandoval*, 532 U.S. at 280-81.

239. Title VI applies to all operations of a school or university that takes federal funding, including disciplinary actions. A school or university's disciplinary practices can unlawfully discriminate when the school intentionally subjects students to different treatment based on race. A school or university that disciplines students of one race more harshly than similarly situated students of another race might violate Title VI.

240. Title VI applies to all operations of a school or university that takes federal funding, including disciplinary actions. A school or university's disciplinary practices can unlawfully discriminate when the school intentionally subjects students to different treatment based on race. A school or university that disciplines students of one race more harshly than similarly situated students of another race might violate Title VI.

241. Title VI prohibits schools, such as CU Boulder, from intentionally disciplining students differently based on race. Intentional discrimination occurs when, as here, a school has a discipline policy that is neutral on its face, but the school administers the policy in a discriminatory manner.

242. Upon information and belief, white students at CU Boulder found responsible for violent assaults that result in life altering injuries have suffered only minor sanctions despite the severity of their policy violations. Indeed, in 2022, a CU Boulder football team member, a white male, was not expelled from the university despite punching a good Samaritan about 30 times, causing a fractured skull, internal brain bleeding, and permanent damage.[20]

[20] *See*, *supra,* n. 17.

243. Selective enforcement of a facially neutral policy against students of one race is also prohibited intentional discrimination. This can occur, for example, when a school official elects to overlook a violation of a policy committed by a student of one racial group, while strictly enforcing the policy against a student who is a member of another racial group.

244. According to OIEC Resolution Procedures, possible sanctions available upon a finding of responsibility include, but are not limited to, warning/written reprimand, educational sanctions, formal disciplinary probation, restriction or denial of university services, delayed conferral of diploma or degree, suspension, exclusion, and expulsion. Ex. 2, § VII(D)(1)(e)(i).

245. Expulsions are rare in cases concerning intimate partner violence that are subject to OIEC Process and Procedures. *See* Ex. 18; Ex. 19. Expulsion requires a student to permanently leave the university and includes an automatic exclusion from University of Colorado property. An expulsion decision results in the student being expelled from all campuses in the University of Colorado system. Importantly, a notation of "Expelled Responsible Sexual Misconduct" remains ***permanently*** on a student's transcript. Ex. 2, § VII(D)(1)(e)(i).

246. CU Boulder's *Student Respondent Statistical Report* shows that similarly situated cases concerning allegations of dating or domestic violence are primarily addressed through remedies-based or other resolutions and are rarely addressed through a formal grievance process. *See*, *supra*, ¶¶ 80, 81.

247. CU Boulder's *Student Respondent Statistical Report* shows that the harsh and unnecessary sanction of expulsion is cases concerning allegations of dating or domestic violence are extremely rare or nonexistent. *See*, *supra*, ¶¶ 80, 81.

248. CU Boulder's disciplinary practices in this case unlawfully discriminated against Plaintiff based on her race when the University intentionally subjected Plaintiff to different treatment based on her race by bringing a formal complaint against Plaintiff in a

EXHIBIT A

case that should have been resolved through an informal process or a remedies-based or other resolution.

249. CU Boulder's disciplinary practices in this case unlawfully discriminated against Plaintiff based on her race when the University intentionally subjected Plaintiff to different treatment based on her race by punishing Plaintiff with the harsh and unnecessary sanction of expulsion.

250. Upon information and belief, similarly situated white students at CU Boulder do not receive the harsh and unnecessary sanction of expulsion for minor accidents that cause no lasting harm.[21]

251. CU Boulder's unlawful discrimination in Plaintiff's discipline, specifically the harsh and unnecessary sanction of expulsion for an incident that was clearly an accident, foreclosed opportunities for Plaintiff, pushing her out of the classroom and diverting her from a path to success in school and beyond.

252. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title VI that found her responsible for sexual misconduct and punished severely for it.

253. As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

254. As a result of the foregoing, Ms. Watson is entitled to prospective injunctive relief, expunging Ms. Watson's disciplinary records, removing any reference to the

[21] While some statistical information concerning CU Boulder's sanctioning practices is publicly available, *see*, *e.g.*, *supra* ¶¶ 80, 81, information regarding race and sanctioning at the university is exclusively within CU Boulder's possession, custody, and control and is not publicly reported. Accordingly, Plaintiff needs to obtain discovery in order to further assess this claim.

EXHIBIT A

expulsion from her education file, and destroying any and all records pertaining to the investigation.

255. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

**COUNT IV**

**BREACH OF CONTRACT**
**(Against CU Boulder)**

256. Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

257. At all times relevant hereto, a contractual relationship existed between CU Boulder and Plaintiff by virtue of Plaintiff's enrollment at CU Boulder and as defined by and through CU Boulder's policies and procedures governing the student disciplinary system, including but not limited to CU Boulder's Sexual Misconduct Policy and OIEC Resolution Procedures.

258. Through these policies and procedures, CU Boulder provided specific, enforceable provisions outlining certain procedures that were to be followed by the University before Plaintiff could be expelled for violation of a university policy.

259. Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

260. Accordingly, through the documents it publishes and provides to students, CU Boulder makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the policies.

261. Under Colorado law, the elements of a claim for breach of contract are (i) the existence of a contract, (ii) the plaintiff's performance of the contract or justification for nonperformance, (iii) the defendant's failure to perform the contract, and (iv) the plaintiff's

EXHIBIT A

damages as a result of the defendant's failure to perform the contract. *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024).

262. Like most jurisdictions, Colorado recognizes that every contract contains an implied duty of good faith and fair dealing. *Id*. at 1140.

263. Based on the aforementioned facts and circumstances, CU Boulder created express and implied contracts when it offered, a Plaintiff accepted, admission to CU Boulder, and when Plaintiff paid the required tuition and fees.

264. CU Boulder committed several breaches of its agreements with Plaintiff during the investigation and adjudication process.

265. CU Boulder's policies and procedures promised a "fair and unbiased" process that "treats all individuals . . . with respect and dignity." As set forth herein, Ms. Watson did not receive a fair and unbiased process and was not treated with respect and dignity.

266. CU Boulder's policies and procedures promise a "fair, impartial and equitable resolution" of complaints. As set forth herein, Ms. Watson did not receive a fair, impartial, and equitable resolution of the complaint Defendant Pomeroy submitted on the University's behalf.

267. CU Boulder's policies and procedures promise "trained officials who do not have a conflict of interest or bias for or against the complainant or respondent. As set forth herein, the University showed bias against Ms. Watson throughout the disciplinary process.

268. CU Boulder's policies and procedures promise and fair and respectful hearing. As sets forth herein, Ms. Watson did not receive a fair and respectful hearing.

269. CU Boulder's policies and procedures promise an investigative report that "fairly summarizes the relevant evidence," including inculpatory and exculpatory evidence. As set forth herein, CU Boulder's Final Investigative Report did not fairly summarize the relevant evidence in Ms. Watson's case.

270. CU Boulder's policies and procedures promised an equal opportunity to be heard, submit information, and identify witnesses who may have relevant information. As set forth herein, CU Boulder did not provide Ms. Watson with an equal opportunity to be heard, submit information, and identify witnesses who may have relevant information.

271. These promises, including the promise of a fair and unbiased process and a fair, impartial, and equitable resolution are sufficiently definite and certain to be enforceable in contract law. *Univ. of Denver*, 547 P.3d at 1140.

272. Defendants also violated their conduct policies when they failed to presume Plaintiff not responsible for the reported conduct at all times during the disciplinary process, until a determination regarding responsibility was made at the conclusion of the formal process. Defendants had already arrived at a predetermined conclusion that Plaintiff was responsible for the alleged misconduct before the investigation process had even begun.

273. Colorado courts recognize an implied covenant of good faith and fair dealing in every contract, which mandates that neither party will do anything that injures the right of the other to receive the benefits of the agreement. In addition to the violations delineated above, CU Boulder violated the covenant of good faith and fair dealing by failing to afford Plaintiff the fair, equitable, unbiased, and impartial disciplinary process to which she was entitled, resulting in an erroneous outcome and the final severe sanction of expulsion.

274. Each of the foregoing breaches contributed to a process that deprived Plaintiff of her fundamental and contractually guaranteed rights, ultimately leading to the adverse and erroneous finding against Plaintiff.

275. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

**276.** As a result of the foregoing, Plaintiff is entitled to damages in excess of $75,000 in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

**COUNT V**

**ESTOPPEL AND RELIANCE**
**(Against CU Boulder)**

277. Plaintiff repeats and incorporates all allegations of this Complaint as if set forth herein.

278. CU Boulder's various policies constitute representations and promises by CU Boulder that the University should reasonably expect to induce action or forbearance by Plaintiff.

279. CU Boulder expected, or should have reasonably expected, Plaintiff to accept its offer of admission, to incur tuition and fee expenses, and choose to not attend other universities based on its express and implied promises that CU Boulder would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff her procedural rights should she be accused of a violation of CU Boulder's policies.

280. To her detriment, Plaintiff relied on these express and implied promises and representations made by CU Boulder.

281. Based on the foregoing, CU Boulder is liable to Plaintiff based upon the principle of estoppel.

282. As a direct, reasonable, and foreseeable consequences of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete her studies at CU Boulder, detrimental impact on her future career and higher education prospects, and other direct and consequential damages.

EXHIBIT A

283. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorney fees, expenses, costs, and disbursements.

**COUNT VI**

**VIOLATION OF THE COLORADO CONSTITUTION**
**(Against CU Boulder)**

284. Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

285. CU Boulder is an agency of the State of Colorado and at all times relevant to this cause of action, CU Boulder and its employees, agents, officers, and directors were acting within the course and scope of the authority, employment, or agency conferred on them by CU Boulder. As a result, all of the alleged conduct here in is attributable to CU Boulder and the State of Colorado.

286. Article II, § 16 of the Constitution of the State of Colorado provides that the accused shall enjoy the "right to appear and defend in person and by counsel; . . . to meet the witnesses against him face to face . . . and a speedy public trial by an impartial jury . . . ."

287. Article II, § 25 guarantees the right to due process, declaring that "no person shall be deprived of life, liberty or property, without due process of law."

288. Article II, § 29 guarantees equality of the sexes, declaring that "[e]quality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex."

289. Defendants have a constitutional obligation to provide a fundamentally fair and reliable process.

290. Defendants conduct violated Plaintiff's constitutional right to meet witnesses against her face to face, in violation of Article II, § 16.

EXHIBIT A

291. Defendants conduct violated Plaintiff's constitutional right to not be deprived of her liberties or property, in violation of Article II, § 25.

292. Defendants conduct denied Plaintiff the guarantee of equality of the sexes, in violation of Article II, § 29.

293. Based on the foregoing, Plaintiff is entitled to a declaration that CU Boulder's policies and procedures, as applied to her, violate the Colorado Constitution.

294. As a direct and foreseeable result of the foregoing violations of Plaintiff's constitutional rights, Plaintiff has suffered the harms and damages alleged above in an amount to be determined by a jury and the imminent irreparable harms necessitating the injunction relief Plaintiff seeks in this action.

295. Plaintiff pleads this direct cause of action under the Colorado Constitution in the alternative to Plaintiff's state law claims should those causes of action be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs committed by the Defendants and their agents and employees.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

i. On the first cause of action for violation of 42 U.S.C. § 1983 procedural due process, a judgement awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs and disbursements, as well as injunctive relief directing CSU to: (1) reverse the outcome, findings, and sanction related to the charges against Plaintiff; (2) expunge Plaintiff's disciplinary record in its entirety; (3) remove any record of the findings and Plaintiff's expulsion from her educational field/disciplinary records/transcript; (4) any and all further actions required to return Plaintiff to the status quo ante;

ii. On the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as

injunctive relief directing CSU to: (1) reverse the outcome, findings, and sanction related to the charges against Plaintiff; (2) expunge Plaintiff's disciplinary record in its entirety; (3) remove any record of the findings and Plaintiff's expulsion from her educational field/disciplinary records/transcript; (4) any and all further actions required to return Plaintiff to the status quo ante;

iii. On the third cause of action for violation of Title VI of the Civil Rights Act of 1964, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements, as well as injunctive relief directing CSU to: (1) reverse the outcome, findings, and sanction related to the charges against Plaintiff; (2) expunge Plaintiff's disciplinary record in its entirety; (3) remove any record of the findings and Plaintiff's expulsion from her educational field/disciplinary records/transcript; (4) any and all further actions required to return Plaintiff to the status quo ante;

iv. On the fourth and fifth causes of action for breach of contract and estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements;

v. On the sixth cause of action for violations of the Colorado Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements; and

vi. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.

//

//

//

EXHIBIT A

Respectfully submitted the 2nd day of October 2025 by

*s/ Jason Savela*
Jason Savela, Esq.
The Savela Law Firm, P.C.
3825 Iris Ave., Suite 100
Boulder, CO 80301
720-260-7392
jason@savelaw.net

**CERTIFICATE OF SERVICE**

I certify that on this 2nd day of October 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

s/ *Jason Savela*